**UNITED STATES of America,
Appellee,**

v.

**Ralph WINCHENBACH, Jr.,
Defendant, Appellant.**

No. 99–1202.

United States Court of Appeals,
First Circuit.

Heard Nov. 2, 1999.

Decided Dec. 2, 1999.

Mary A. Davis, with whom Tisdale & Davis, P.A., was on brief, for appellant.

F. Mark Terison, Senior Litigation Counsel, with whom Jay P. McCloskey, United States Attorney, was on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

SELYA, Circuit Judge.

This appeal raises two important issues. One requires us to determine for the first time whether the police, equipped with a search warrant but not an arrest warrant, may enter the home and immediately arrest a resident on the basis of previously acquired probable cause. The second requires us to plot the line of demarcation between two closely related but poorly understood rules of evidence, Fed.R.Evid. 608(b) and Fed.R.Evid. 613(b). Concluding, as we do, that the arrest and the search conducted incident thereto were constitutionally permissible and that the trial court's admission of the challenged extrinsic evidence passes muster, we affirm the judgment of conviction.

## I. BACKGROUND

We offer only a synopsis of the evidentiary record, borrowing liberally from the district court's more detailed rendition. *See United States v. Winchenbach,* 31 F.Supp.2d 159, 160–62 (D.Me.1998). We

later supplement our account in the course of discussing specific assignments of error.

Over a period of approximately five months in mid–1997, the Maine Drug Enforcement Agency (MDEA), working in concert with a confidential informant named James Holmes, fomented a series of "controlled" drug transactions. The first occurred in April. Acting on the MDEA's instructions, Holmes gave Wendy Spinney (a target of the probe) $250 in exchange for Spinney's promise to deliver cocaine. Although Spinney told Holmes that she would procure the cocaine in Rockland, agents followed her to the Ralph Wink Road, a dead-end street in Waldoboro. She disappeared for a brief interval, but the agents then spied her returning from the Ralph Wink Road and trailed her to a motel (where she delivered the cocaine to Holmes).

On May 30, Holmes called Spinney to arrange another purchase. He then went to her abode and gave her $250. Although Spinney again told Holmes that she would go to Rockland to obtain drugs, agents followed her to Duck Puddle Road (a street leading to Genther Road, which accesses the Ralph Wink Road). A short time later, the agents spotted her coming from the direction of the Ralph Wink Road. Upon returning home, Spinney called Holmes and informed him that she could not get any cocaine.[1]

On June 5, Holmes again called Spinney and arranged to buy an "eight-ball" of cocaine. He visited her residence—as was typically the case, the MDEA chauffeured him there—and in the ensuing conversation, Spinney identified her supplier as "Junior" and specified that he was based in Waldoboro. This time, the agents tracked Spinney to a trailer on the Ralph Wink Road in which defendant-appellant Ralph Winchenbach, Jr. resided with his quondam paramour, Arlene Jones (formerly Arlene Winchenbach, by virtue of her earlier marriage to one of the appellant's brothers).[2] Spinney spent nearly ten minutes inside the trailer and then returned directly to her home. When Holmes arrived, she gave him the promised eight-ball of cocaine.

On September 3, the MDEA again set Holmes into motion. On this occasion, he gave Spinney $250 at her dwelling. She said that she would go "to Duck Puddle" to retrieve the cocaine and that her supplier was waiting for her "at Junior's house." Agents followed Spinney and a companion, later identified as William Holmstrom, to Duck Puddle Road. They were last seen heading in the direction of the Ralph Wink Road. After a ten-minute interval, an agent observed the pair traveling from the direction of the Ralph Wink Road. At that point, the officers arrested both Spinney and Holmstrom. Spinney had cocaine in her purse.

Upon interrogation, Spinney told the agents that she bought the cocaine for $200 from "Junior" just prior to her arrest and that "Junior" lived in a trailer on the Ralph Wink Road. She added that she had purchased cocaine from "Junior" at his trailer on about 30 occasions and referred to him at one point as "Junior Winchenbach." When asked whether "Junior" was Ralph Winchenbach, Jr., Spinney replied that she thought so.

The MDEA promptly applied for a warrant to search, inter alia, "[t]he Ralph Winchenbach Jr and Arlene Winchenbach

---

**1.** Spinney later told Holmes that she was unable to obtain cocaine from Rockland and that the people with whom she dealt in Waldoboro were "out."

**2.** In a pro se submission, the appellant asserts for the first time that he did not reside in the trailer. This assertion contradicts the stipulated record. *See Winchenbach,* 31 F.Supp.2d at 162 n. 5. It is further belied by the fact that, although Arlene Jones owned the trailer, she maintained the telephone listing in the appellant's name. At any rate, arguments raised for the first time on appeal are deemed waived. *See Campos–Orrego v. Rivera,* 175 F.3d 89, 95 (1st Cir.1999); *United States v. Zannino,* 895 F.2d 1, 17 (1st Cir. 1990).

residence in Waldoboro, located on the Ralph Wink [R]oad box # 277" as well as "[a]ny and all people present and arriving at the residence at the time of the search, including but not limited to Ralph Winchenbach Jr and Arlene Winchenbach." The affidavit supporting the warrant described the location and appearance of the trailer at some length and stated unequivocally that it was the same trailer that Spinney had described to the arresting officers. A state magistrate granted the application and issued a warrant that authorized a search of the premises.[3]

The same evening, a team of officers went to the appellant's trailer on the Ralph Wink Road to execute the search warrant. When the appellant opened the door, the officers immediately entered the trailer, arrested him, brought him outside, and searched him. They discovered over $1,000 on his person, including $80 of the "buy money" that the MDEA had given to Holmes earlier that day.

A federal grand jury indicted the appellant for distribution of cocaine. *See* 21 U.S.C. § 841(a)(1). The district court denied his motion to suppress the evidence obtained as a result of the arrest and the ensuing search of his person, noting that the officers had probable cause to effect an arrest and that they were lawfully present in the appellant's home. *See Winchenbach*, 31 F.Supp.2d at 165–67. A petit jury subsequently found the appellant guilty, and the district court imposed a 37–month incarcerative sentence. This appeal followed. In it, Winchenbach challenges both the denial of his motion to suppress and an evidentiary ruling. We address these questions seriatim.

**3.** The warrant, however, did not authorize a search of the person of any individual. The appellant translates this omission into a "finding" that the MDEA lacked probable cause to arrest anyone. Inasmuch as the agents did not apply for an arrest warrant, the magistrate's failure to issue one cannot be construed as any sort of finding concerning the existence *vel non* of probable cause to arrest

## II. THE MOTION TO SUPPRESS

■ The appellant argues that his arrest was unlawful and that, therefore, the district court should have suppressed the evidence gleaned from the search of his person. The second half of this argument depends on the validity of the first: it is settled beyond peradventure that a search of an individual's person made incident to a valid arrest is itself valid, despite the absence of an arrest warrant. *See, e.g., United States v. Robinson*, 414 U.S. 218, 224, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973); *Chimel v. California*, 395 U.S. 752, 762–73, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969). Put another way, "[t]he fact of a lawful arrest, standing alone, authorizes a search." *Michigan v. DeFillippo*, 443 U.S. 31, 35, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). Hence, we turn directly to the legitimacy of the arrest.

■ The appellant does not contest the bona fides of the warrant that authorized the search of his dwelling but, rather, asseverates that a search warrant, unaccompanied by an arrest warrant, can never support an arrest of an individual in his own home. Building on this foundation, he posits that the fruits of the subsequent search of his person must be suppressed. The government responds that because the search warrant enabled the officers lawfully to enter the home and because probable cause existed to believe that the appellant had committed a crime, the officers had a right to effect an arrest without first pausing to secure a separate arrest warrant. The district court adhered to the government's view and refused suppression. *See Winchenbach*, 31 F.Supp.2d at 167. We assess its conclusions of law de novo but scrutinize its factual findings only for clear

the appellant. Moreover, the government categorizes the discrepancy between the warrant application and the warrant itself as the inadvertent product of the haste with which the agents drafted the latter for the magistrate's signature. Because the record sheds no light on how this anomaly arose, we would in any event decline to attach decretory significance to it.

error. *See United States v. Schaefer,* 87 F.3d 562, 565 (1st Cir.1996); *United States v. Zapata,* 18 F.3d 971, 975 (1st Cir.1994). "'[T]he decision whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to ... probable cause' presents a mixed question of law and fact which is subject to plenary review." *United States v. Meade,* 110 F.3d 190, 193 (1st Cir.1997) (quoting *Ornelas v. United States,* 517 U.S. 690, 696, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996)).

■ The appellant's primary position, purportedly grounded in the Supreme Court's decision in *Payton v. New York,* 445 U.S. 573, 576, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), is that law enforcement officers can never arrest a person in his home unless they first obtain an arrest warrant. But *Payton* does not sweep so broadly. To be sure, the *Payton* Court held on particular facts that officers who did not possess an arrest warrant could not enter the defendant's home to arrest him. *See id.* at 590, 100 S.Ct. 1371. As subsequent cases demonstrate, however, *Payton* does not purport to declare an absolute rule. One recognized exception involves exigent circumstances. *See, e.g., Hegarty v. Somerset County,* 53 F.3d 1367, 1374 (1st Cir.1995). Another applies to parolees and persons on probation. *See, e.g., United States v. Cardona,* 903 F.2d 60, 67, 69 (1st Cir.1990). A third, the precise scope of which is here at issue, permits the police to arrest an individual in his home, without an arrest warrant, as long as they are lawfully on the premises (by reason, say, of a search warrant) and probable cause exists. *See, e.g., Mahlberg v. Mentzer,* 968 F.2d 772, 775 (8th Cir. 1992); *United States v. Houston,* 892 F.2d 696, 701–02 (8th Cir.1989); *Jones v. City of Denver,* 854 F.2d 1206, 1209 (10th Cir. 1988). In these cases, the police discovered the evidence that gave rise to probable cause *during* a lawful search of the premises and then arrested the occupant. We have found one case, *United States v.*

*Price,* 888 F.2d 1206 (7th Cir.1989), in which the court treated the arrest as taking place (with probable cause) immediately upon entry by the police, prior to any search. *See id.* at 1208–09; *see generally* 3 Wayne R. LaFave, *Search and Seizure* § 6.1(c), at 245 (3d ed.1996). We deem both situations to be covered by the same principle. We explain briefly.

Courts typically have predicated this exception on a "greater subsumes the lesser" analysis, reasoning that:

> A search warrant represents a judicial determination that there is probable cause to invade the privacy of the suspect's home. The impartial determination that supports the issuance of a search warrant justifies a greater intrusion than that supporting the issuance of an arrest warrant. Thus, once an officer has procured a search warrant, the privacy interests that led to the imposition of an arrest warrant requirement in *Payton* have been protected.

*Jones,* 854 F.2d at 1209 (italics omitted). This analysis does not contradict *Payton,* as the Court there did not speak so much to the matter of arrest as to the matter of unauthorized entry into a dwelling. *See Payton,* 445 U.S. at 588–90, 100 S.Ct. 1371; *see also New York v. Harris,* 495 U.S. 14, 17, 110 S.Ct. 1640, 109 L.Ed.2d 13 (1990) (explaining that "the rule in *Payton* was designed to protect the physical integrity of the home"). Thus, the logic underpinning *Mahlberg* and *Jones* embraces equally cases where, as here, an arrest takes place immediately after the officers' arrival at the dwelling and is based on previously-acquired probable cause. After all, *"Payton* is grounded (as the Court put it) in 'the breach of the entrance to an individual's home.' That is, it is the otherwise unauthorized *entry* and not the arrest which gives rise to the warrant requirement." LaFave, *supra,* § 6.1(c) at 249 (emphasis supplied); *accord* 1 David S. Rudstein et al., *Criminal Constitutional Law* ¶ 2.05[3], at 2–189 to 2–190 (1998) ("A police officer acting upon probable cause

also may make a warrantless arrest in premises not open to the general public when he has lawfully entered the premises, for example, pursuant to a search warrant...").

We believe it follows that, once the police gain lawful entry to residential premises (as by a search warrant), an immediate arrest is permissible without a separate arrest warrant as long as evidence known to the officers before the search supplies probable cause for the arrest.[4] *See* LaFave, *supra,* § 6.1(c), at 249 & n. 114 (citing, inter alia, the *Mahlberg* line of cases). While the matter apparently is one that has received little attention in the federal appellate courts, a number of respected state courts, applying federal constitutional principles, have reached this conclusion. *See, e.g., State v. Ware,* 219 Neb. 594, 365 N.W.2d 418, 421 (1985); *People v. Kite,* 97 Ill.App.3d 817, 53 Ill. Dec. 140, 423 N.E.2d 524, 526, 530–31 (1981); *State v. Turner,* 29 Wash.App. 282, 627 P.2d 1324, 1326–28 (1981); *State v. Ruth,* 181 Conn. 187, 435 A.2d 3, 6–7 (1980); *cf. People v. McCarter,* 117 Cal. App.3d 894, 173 Cal.Rptr. 188, 193, 196 (1981) (applying California law and holding that "[i]f officers have authorization to enter the home, an arrest inside is of no greater constitutional significance than an arrest elsewhere").

The appellant, who cites no case (federal or state) that holds to the contrary, resists this view, complaining that it diminishes the stature of arrest warrants and renders them virtually obsolete. There is a kernel of truth in this lament, but warrantless felony arrests outside of the home routinely have survived constitutional attack as long as probable cause exists. *See, e.g., Tennessee v. Garner,* 471 U.S. 1, 7, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985); *United States v. Watson,* 423 U.S. 411, 423–24, 96 S.Ct. 820, 46 L.Ed.2d 598 (1976). From a Fourth Amendment standpoint, there is no

valid reason why the same principle should not apply to arrests within a suspect's residence so long as the police are there lawfully. In that event, "a warrantless arrest there is no more objectionable than a warrantless arrest on the street." LaFave, *supra,* § 6.1(b), at 236 n. 56.

The appellant also suggests that following this rule will permit the police to play cat and mouse with a suspected criminal, forgoing an arrest warrant despite the ascertained existence of probable cause and postponing an arrest until the mood strikes. This argument has been made and rejected before in analogous contexts, *see, e.g., Watson,* 423 U.S. at 414, 423–24, 96 S.Ct. 820 (holding that a warrantless arrest based on probable cause may be made in a public place even though the officers had ample prior opportunity to obtain an arrest warrant, yet eschewed that course); *United States v. DeMasi,* 40 F.3d 1306, 1312 (1st Cir.1994) (refusing "to attach significance to the ̇fact that the government had ample time to ̇obtain a warrant but declined to procure one"), and we reject it here. Put simply, when probable cause exists, the timing of an arrest is a matter that the Constitution almost invariably leaves to police discretion. *See, e.g., Watson,* 423 U.S. at 423–24, 96 S.Ct. 820; *United States v. Bizier,* 111 F.3d 214, 216–17, 220 (1st Cir.1997).

We hold, therefore, that if the police have gained lawful entry to an individual's home based on a valid search warrant, they may arrest the individual before commencing the search, provided that they have probable cause to do so. Consequently, the issue before us reduces to whether the facts and circumstances within the agents' knowledge at the time of Winchenbach's arrest were sufficient to yield probable cause. Like the district court, *see Winchenbach,* 31 F.Supp.2d at 165, we conclude that they were.

---

4. Of course, when the arrest occurs immediately, evidence acquired during the ensuing search may not be used to justify it retrospec-

tively. *See United States v. Bizier,* 111 F.3d 214, 217 (1st Cir.1997).

Prior opinions guide this inquiry. We begin with bedrock: probable cause to effect an arrest does not require the same level of certitude or quantum of proof that is necessary to convict. *See United States v. Figueroa*, 818 F.2d 1020, 1023 (1st Cir.1987). Instead, probable cause exists when, "at th[e] moment [the arrest is made,] the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [individual] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964). For this purpose, the "fellow officer" rule applies, so that as a general matter (subject to exceptions not pertinent here), the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation. *See Meade*, 110 F.3d at 193–94.

We need not dwell on generalities. In the last analysis, probable cause requires practical, context-specific determinations, made case by case, that give due weight to the totality of the circumstances and the trial court's superior coign of vantage. *See Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983); *United States v. Aguirre*, 839 F.2d 854, 857–58 (1st Cir.1988). If the circumstances supportably found "warrant the officer's reasonable belief that the action taken is appropriate, the arrest is justified." *Logue v. Dore*, 103 F.3d 1040, 1044 (1st Cir.1997). Thus, the dispositive question here is whether the officers' collective knowledge at the moment of the arrest justified a prudent person in believing that the appellant had distributed cocaine.

Having reviewed the stipulated record with care, we find the answer to this question readily apparent. The MDEA had received several tips that the appellant was selling drugs on the Ralph Wink Road and had responded by enlisting Holmes's cooperation and placing Spinney under episodic surveillance. Prior to each "controlled" purchase of cocaine, the agents searched Holmes to ensure that he had no contraband—and on three of the four occasions, he returned with cocaine. During each of the four contemplated transactions, the authorities followed Spinney either to the Ralph Wink Road (where the appellant resided) or to Duck Puddle Road (which led to the Ralph Wink Road). On the latter occasions, the lawmen witnessed her return from the direction of the Ralph Wink Road. Once, two MDEA agents actually followed Spinney to the appellant's trailer (where she apparently obtained cocaine). In conversation, Spinney told Holmes, among other things, that her cocaine source was "Junior," who lived in Waldoboro. To cap matters, at the time of the last transaction, Spinney (1) told Holmes that her supplier was waiting for her "at Junior's"; (2) informed her captors when arrested that she had just purchased the cocaine found in her purse from "Junior Winchenbach," who lived in a trailer on the Ralph Wink Road; and (3) described a long course of dealing that involved roughly 30 purchases from "Junior" at that locus. What Spinney had to say was corroborated not only by Holmes and by the officers' own observations, but also by Holmstrom, who confirmed that he had accompanied Spinney to the Ralph Wink Road to obtain cocaine on the day of her arrest.

The appellant counters this formidable factual array by suggesting that the record does not foreclose other inferences. For instance, Spinney might have purchased the cocaine from the appellant's brother, Dale Winchenbach, a known cocaine user who previously had owned the trailer and who still lived on the Ralph Wink Road, albeit in another mobile home. Nor is this all; he offers several other possible scenarios. No useful purpose would be served by debating these alternatives. The probable cause standard does not require the officers' conclusion to be ironclad, or even highly probable. Their

conclusion that probable cause exists need only be reasonable. *See Texas v. Brown,* 460 U.S. 730, 742, 103 S.Ct. 1535, 75 L.Ed.2d 502 (1983); *United States v. Feliz,* 182 F.3d 82, 87 (1st Cir.1999), *cert. denied,* —— U.S. ——, 120 S.Ct. 942, —— L.Ed.2d —— (2000).

The same logic dooms the appellant's argument that, during the final transaction, Spinney did not have sufficient time to drive to and from the Ralph Wink Road. The appellant's calculations are based on rough estimates and do no more than reveal a minor temporal disparity. Given the facts as a whole, this disparity does not suffice to render unreasonable the officers' belief that Spinney purchased cocaine from the appellant.

The appellant also faults the controls employed by the agents and remonstrates that, as a result, Spinney's statements lacked corroboration. In *United States v. Khounsavanh,* 113 F.3d 279 (1st Cir.1997), however, we remarked that "[t]he risk that [an] informant is lying or in error need not be wholly eliminated. Rather, what is needed is that 'the probability of a lying or inaccurate informer has been sufficiently reduced by corroborative facts and observations.'" *Id.* at 284 (citation omitted). In our view, the evidence gathered here, including several recorded conversations between Holmes (who at times wore a body wire) and Spinney and the agents' own observations (especially those pertinent to the third transaction), affords sufficient corroboration to reduce the risk of error to an acceptable level.[5]

We will not paint the lily. Taking the totality of the circumstances presented, the agents' belief that the appellant was engaged in the distribution of cocaine was eminently reasonable, and the facts as supportably found by the trial court, *see Winchenbach,* 31 F.Supp.2d at 160–62, provide solid underpinning for the court's conclusion that probable cause for the appellant's arrest existed. It follows inexorably that the lower court did not err in denying the suppression motion.

## III. THE EVIDENTIARY QUESTION

At trial, the appellant called Arlene Jones's son, Robbie Flint, as an alibi witness. Flint testified, inter alia, that the appellant was not in the trailer when Spinney arrived on September 3. On cross-examination, the following exchange took place:

Q: Do you have any knowledge of [the appellant's] selling drugs or being involved in drugs on September 3rd 1997?

A: No.

Q: None at all?

A: No.

Q: As far as you know he was not involved in anything?

A: Right.

Q: ... [I]n that interview with [agent] Dan Bradford, you did talk about [the appellant's] drug activity that night, didn't you?

A: No.

Q: You didn't? Well, isn't it true that what you told Dan Bradford was that the night that MDEA searched the house ... they missed several ounces of cocaine that were buried in jars outside the residence?

A: No.

Q: You did not tell that to Dan Bradford?

A: No I didn't.

---

5. The appellant cites *Khounsavanh* for the proposition that probable cause does not exist where an individual has been identified only by a nickname. In that case, however, no evidence linked the defendants to the premises to be searched. *See* 113 F.3d at 281–82. The contrast is stark: here, the warrant application stated categorically that the trailer had been identified as that of Ralph Winchenbach, Jr., and at the time of the arrest, the officers knew the appellant's real name and had every reason to believe that he was the person from whom Spinney had been buying cocaine. Because sufficient evidence existed prior to the arrest to connect the appellant to the premises and to support a filing of probable cause, *Khounsavanh* does not assist the appellant.

On redirect examination, defense counsel ignored this testimony. In rebuttal, however, the prosecutor called Bradford and sought to interrogate him about the conversation. The court overruled the appellant's objections, and Bradford testified that he spoke with Flint some months after the fact and that Flint, in an effort "to redeem himself" for assisting in a jailbreak, told him that the agents overlooked a quantity of buried cocaine during the search of Winchenbach's trailer. The judge then instructed the jury to consider Bradford's testimony only as it related to Flint's credibility and not for the truth of the matter asserted.

■■■ We review the district court's admission of this evidence for abuse of discretion. *See United States v. Houlihan,* 92 F.3d 1271, 1297 (1st Cir.1996), *cert. denied,* 519 U.S. 1118, 117 S.Ct. 963, 136 L.Ed.2d 849 (1997). The appellant maintains that such an abuse occurred because the court should have excluded Bradford's testimony under either Fed.R.Evid. 608(b) or Fed.R.Evid. 403. We address both objections.

### A. *Rule 608(b).*

In this court, as below, the government parries the appellant's Rule 608(b) objection by claiming that Rule 613(b), not Rule 608(b), controls. On a superficial level at least, an apparent tension exists between these two rules. Rule 608(b) bars the credibility-related use of some extrinsic evidence,[6] while Rule 613(b), albeit by negative implication, permits the credibility-related use of some extrinsic evidence if the proponent satisfies certain enumerated conditions.[7] In this instance, the appellant characterizes Bradford's testimony as extrinsic evidence relating to a specific in-

stance of Flint's misconduct, offered by the prosecutor to attack Flint's credibility (and thus prohibited by Rule 608(b)). The government demurs, characterizing the testimony as extrinsic evidence of a prior inconsistent statement made by Flint, offered after Flint had been afforded an opportunity to explain or deny the remark and in circumstances wherein the appellant had a full opportunity to interrogate both Flint and Bradford on the matter (and thus admissible under Rule 613(b)).

■■■ At first blush, neither of these characterizations seems implausible—but they cannot both be right. There are, moreover, two wrinkles. In the first place, the district court, though deeming the evidence admissible, mistakenly relied on Rule 608(b). This bevue need not detain us, for the trial court's use of an improper ground for admission of evidence is harmless if the evidence was admissible for the same purpose on some other ground. *See United States v. Walsh,* 928 F.2d 7, 10 n. 10 (1st Cir.1991); *United States v. Nivica,* 887 F.2d 1110, 1127 (1st Cir.1989). Thus, this wrinkle irons itself out.

■■■ In the second place, each party presses a theory that fails to fit. The appellant seems to say that the evidence should be excluded under Rule 608(b) simply because it was offered to impugn Flint's credibility. This is an overbroad generalization which, among its other vices, contradicts the time-honored tenet that prior inconsistent statements ordinarily may be used to impeach a witness's credibility. *See United States v. Hale,* 422 U.S. 171, 176, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975); *United States v. Martin,* 694 F.2d 885, 888 (1st Cir.1982); *see also* 4 Jack B. Weinstein & Margaret A. Berger, *Wein-*

---

**6.** Rule 608(b) provides in pertinent part that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility ... may not be proved by extrinsic evidence."

**7.** Rule 613(b) provides that "[e]xtrinsic evidence of a prior inconsistent statement by a

witness is not admissible unless the witness is afforded an opportunity to explain or deny the same and the opposite party is afforded an opportunity to interrogate the witness thereon, or the interests of justice otherwise require."

*stein's Federal Evidence* § 613.02[1] (2d ed.1997). In the bargain, this interpretation of Rule 608(b) leaves no room at all for the admission of extrinsic impeachment evidence under the auspices of Rule 613(b). Thus, we reject it.

For its part, the government urges us to hold that a strict statement/conduct dichotomy triggers the choice of rule. Under this dichotomy, Rule 613(b) always would apply to statements and Rule 608(b) always would apply to conduct. A glance at the case law unmasks this gross oversimplification. Cases invoking Rule 608(b) in respect to statements, as opposed to conduct, are not uncommon. *See, e.g., United States v. Cudlitz*, 72 F.3d 992, 996 (1st Cir.1996) (dealing with prior perjurious statements); *United States v. Brooke*, 4 F.3d 1480, 1484 (9th Cir.1993) (dealing with defendant's bogus claim to be suffering from terminal cancer in prosecution for manufacture of a destructive device); *United States v. Sellers*, 906 F.2d 597, 602 (11th Cir.1990) (dealing with witness's lie to secure hospital admission, unrelated to ongoing prosecution). The commentators likewise abjure the proffered distinction. *See, e.g.,* 1 Kenneth S. Broun et al., *McCormick on Evidence* § 41, at 138 n. 5 (4th ed.1992) (citing cases listing perjury and false statements as among the instances of conduct covered by Rule 608(b)). We, too, reject it.

■ Although we cannot accept either of the parties' self-serving taxonomies, we think that there is a principled distinction between the types of evidence covered by the two rules. In our view, Rule 613(b) applies when two statements, one made at trial and one made previously, are irreconcilably at odds. In such an event, the cross-examiner is permitted to show the discrepancy by extrinsic evidence if necessary—not to demonstrate which of the two is true but, rather, to show that the two do not jibe (thus calling the declarant's credibility into question). *See, e.g., United States v. Higa*, 55 F.3d 448, 451–52 (9th Cir.1995); *Kasuri v. St. Elizabeth Hosp.*

*Med. Ctr.*, 897 F.2d 845, 853–54 (6th Cir. 1990); *United States v. Causey*, 834 F.2d 1277, 1282–83 (6th Cir.1987); *United States v. Lay*, 644 F.2d 1087, 1090 (5th Cir.1981). In short, comparison and contradiction are the hallmarks of Rule 613(b). As one treatise puts it:

> The theory of attack by prior inconsistent statements is not based on the assumption that the present testimony is false and the former statement true but rather upon the notion that talking one way on the stand and another way previously is blowing hot and cold, and raises a doubt as to the truthfulness of both statements.

*McCormick on Evidence, supra,* § 34, at 114.

■ In contrast, Rule 608(b) addresses situations in which a witness's prior activity, whether exemplified by conduct or by a statement, in and of itself casts significant doubt upon his veracity. *See Kasuri*, 897 F.2d at 854. Thus, Rule 608(b) applies to, and bars the introduction of, extrinsic evidence of specific instances of a witness's *misconduct* if offered to impugn his credibility. *See McCormick on Evidence, supra,* § 41, at 138. So viewed, Rule 608(b) applies to a statement, as long as the statement in and of itself stands as an independent means of impeachment without any need to compare it to contradictory trial testimony. *See, e.g., Cudlitz,* 72 F.3d at 996; *Brooke,* 4 F.3d at 1484; *United States v. Lopez,* 944 F.2d 33, 37–38 (1st Cir.1991); *United States v. Jackson,* 882 F.2d 1444, 1448 (9th Cir.1989).

■ Applying this analysis to the case at hand, Bradford's testimony falls within the compass of Rule 613(b). At trial, Flint denied any knowledge of drug dealing at the premises, of the appellant's involvement with drugs, or of having told the agent about jars of cocaine buried in the yard. Bradford's testimony—that Flint had told him that the MDEA, in searching the premises, had overlooked several ounces of buried cocaine—directly contra-

dicted Flint's trial testimony in all three respects and therefore constituted extrinsic evidence of a prior inconsistent statement.

The appellant's contrary argument will not work unless the statement attributed to Flint by Bradford, standing alone and without any reference to Flint's trial testimony, somehow calls into question Flint's credibility. The testimony fails this test: the appellant does not squarely argue that the mere assertion that the officers missed some buried jars of cocaine during their search of the premises, offered in an effort to cooperate with law enforcement, sinks to the level of an affirmative example of *Flint's* misconduct such as would significantly affect Flint's credibility, and such an argument, if made, would be unconvincing. It is only the comparison of the earlier statement with Flint's trial testimony that imbues the evidence with probative value for impeachment purposes.

■ That ends the matter. Inasmuch as Flint was afforded an opportunity to explain or deny the prior inconsistent statement and the appellant had a chance to interrogate him about it, the conditions for the operation of Rule 613(b) were fully satisfied. Unless some other ground of objection looms—a matter to which we now turn—Bradford's testimony was admissible under that rule. *See Causey*, 834 F.2d at 1283; *Lay*, 644 F.2d at 1090.

### B. *Rule 403.*

■ As a fallback, the appellant contends that the district court should have excluded Bradford's testimony on the ground that its unfairly prejudicial effect overbalanced its legitimate worth. This contention rests on Fed.R.Evid. 403, which provides in pertinent part that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."

■ We review the admission or exclusion of evidence under Rule 403 for abuse of discretion. *See United States v. Rivera–Gomez*, 67 F.3d 993, 997 (1st Cir. 1995); *United States v. Ingraham*, 832 F.2d 229, 233 (1st Cir.1987). We afford wide latitude to trial courts in these purlieus, taking care to "evaluate the trial court's decision from its perspective when it had to rule and not [to] indulge in review by hindsight." *Old Chief v. United States*, 519 U.S. 172, 182 n. 6, 117 S.Ct. 644, 136 L.Ed.2d 574 (1997). "Only rarely—and in extraordinarily compelling circumstances—will we, from the vista of a cold appellate record, reverse a district court's on-the-spot judgment concerning the relative weighing of probative value and unfair effect." *Freeman v. Package Mach. Co.*, 865 F.2d 1331, 1340 (1st Cir.1988).

Virtually all evidence is designed to be prejudicial (i.e., to help one side's case and to hurt the other's); therefore, Rule 403 concerns itself not with prejudice per se but with *unfair* prejudice. It guards against "the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief,* 519 U.S. at 180, 117 S.Ct. 644. Attempting to wrap himself in this mantle, the appellant hypothesizes that Bradford's testimony ineluctably led the jury to believe that the appellant was "a big time drug dealer." Appellant's Br. at 24.

In passing upon this objection at trial, the lower court made a balanced apprisal of the situation. In the process, the court noted the high probative value of the evidence—Flint, after all, was an alibi witness whose testimony, if credited, would have exonerated Winchenbach—and concluded that it was not unduly prejudicial. In these circumstances, we discern no abuse of the court's discretion.

We add only two comments. First, the prosecutor already had brought the contents of the purported conversation to the jury's attention when, without objection, he cross-examined Flint about it. This draws much of the sting from the appellant's claim. *See Ingraham,* 832 F.2d at

236 (suggesting that the court, when performing the requisite balancing under Rule 403, may take into account the jury's familiarity with the substance of the evidence). Second, the court prudently minimized any unfairly prejudicial impact by an immediate instruction that directed the jury to consider the statements attributed to Flint only "for the limited purpose of whatever effect they may have in your judgment upon [his] credibility." In that connection, the court explicitly warned the jurors not to "use [the evidence] for the purpose of proving the truth of what [Flint] said out-of-court." We have frequently remarked the prophylactic effect of such limiting instructions, *see, e.g., Houlihan*, 92 F.3d at 1285; *United States v. O'Bryant*, 998 F.2d 21, 26 (1st Cir.1993), and see no reason in this instance to abandon the "almost invariable assumption of the law that jurors follow their instructions," *Richardson v. Marsh*, 481 U.S. 200, 206, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987).

## IV.  CONCLUSION

We need go no further. For the reasons stated, we uphold the district court's denial of the appellant's motion to suppress and reject the appellant's claim that the jury should not have been allowed to hear extrinsic evidence anent Flint's prior inconsistent statement to Bradford as an aid to evaluating Flint's credibility. For aught that appears, Winchenbach was fairly tried and justly convicted.

*Affirmed.*