**Giovanni REID**

v.

**Donald VAUGHN, et al.**

**No. CIV.A. 01–2385.**

United States District Court,
E.D. Pennsylvania.

Aug. 27, 2003.

Thomas W. Dolgenos and David Curtis Glebe, Office of The District Attorney, Philadelphia, PA, for Donald Vaughn.

Daniel Silverman, Law Offices Daniel Silverman & Assoc., Philadelphia, PA, for Giovanni Reid.

## MEMORANDUM

DALZELL, District Judge.

In order to resolve this long-pending habeas petition by a state prisoner,[1] on July 22, 2003 we convened a hearing to determine what happened in a conversation between a cooperating witness and the prosecutor in petitioner Giovanni Reid's second-degree murder trial in the Philadelphia Court of Common Pleas in January of 1993. The Commonwealth of Pennsylvania and Reid stipulated that petitioner's counsel first learned of this conversation when on July 18, 1998 he read an account of Reid's trial in Buzz Bissinger's well-known book, *A Prayer for the City.*

On reading Bissinger's account, Reid's counsel then and there concluded that the previously unreported conversation meant that the Assistant District Attorney had run afoul of his duty under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) to disclose exculpatory evidence. Ten days later, Reid filed with

---

1. We have jurisdiction under 28 U.S.C. § 2254.

the Pennsylvania Superior Court an application for remand of his appeal of Judge David Savitt's denial of his petition under the Pennsylvania Post–Conviction Relief Act. On the same day, Reid filed with Judge Savitt a motion for new trial based on this after-discovered evidence.

The Superior Court denied the application for remand. Although Reid requested an evidentiary hearing on the *Brady* claim in his appellate brief, that Court denied the request.[2]

As detailed in a March 4, 2003 Memorandum, and again on May 2, 2003 (on the Commonwealth's motion for reconsideration), we held that the Anti–Terrorism and Effective Death Penalty Act of 1996, 28 U.S.C. § 2254(e)(2), did not divest us of authority to conduct a hearing on Reid's petition because we concluded that he did not "fail[ ] to develop the factual basis of [his *Brady* ] claim" in the Pennsylvania courts. *See Reid v. Vaughn,* No. 01–2385, 2003 WL 924080, at *4 nn. 9–10 (E.D.Pa. Mar.4, 2003). As noted, we ultimately convened that hearing on July 22, 2003 and heard the testimony of the cooperating witness, the trial prosecutor, and Bissinger; we also heard the testimony of Reid's trial counsel.

Before considering this testimony in detail, we turn first to describe the context of the conversation at issue, which occurred at Giovanni Reid's murder trial in Philadelphia's City Hall in January of 1993.

*The Relevant State Proceedings*

Reid was charged in September, 1991 with murder, robbery and other offenses which arose from the point-blank shooting on August 10, 1991 of Robert Janke. At about 5:30 a.m. that August 10, Janke, a University of Pennsylvania medical student, was at a phone booth near 17th and South Streets in Philadelphia. Janke discovered that he had left his apartment keys in a bag left in his friend's car, and was thus locked out of his nearby home.

The Commonwealth charged that as Janke awaited his friend's return with the bag and his keys, three black males walked up and surrounded him. The Commonwealth claimed the three were Giovanni Reid, Carlton Bennett and Dwayne Bennett. The Commonwealth's evidence also showed that there were three other young black males nearby, Tyrone Mackey, Richard King and DeJuan Bennett. According to the Commonwealth, Reid, Carlton Bennett and Dwayne Bennett surrounded Janke, and Dwayne Bennett pointed a gun at him, demanding that he produce his wallet. When the gang saw that the wallet only contained $5.00, Dwayne Bennett "took the gun and put it up to Mr. Janke's right temple . . . and pulled the trigger," N.T. of Jan. 21, 1993, at 41.[3] Janke died within twenty-four hours.

Carlton Bennett and Giovanni Reid were tried together before the Honorable David N. Savitt and a jury commencing on January 21, 1993. Dwayne Bennett had pleaded guilty of murder the day before. A bystander, Nurse Lorraine Hill, was present to testify as to what she saw that morning and reported that three black

---

**2.** *Commonwealth v. Reed,* No. 1725 Phila.1998, at 4–10, 742 A.2d 1150 (Pa.Super.1999). The petition here is signed by "Giovanni Reid", but throughout the state court proceedings he is referred to as "Giovanni Reed", a spelling that Bissinger understandably followed in his book. We take petitioner's signature spelling as authoritative.

**3.** We here distinguish the Notes of Testimony of the 1993 trial from those of our hearing ten and a half years later by referring to the former as "N.T." and the latter as "Hearing Tr.".

males were around Janke at the time of the shooting. She testified:

> As I started approaching 17th Street by this drugstore, I seen this black male and he turned and he seen me and he walked towards me.
>
> . . .
>
> And I crossed to the north side of South Street. As I was crossing 17th Street, he went back towards—there was a corner store. At that time there was a white gentleman sitting in the middle and there was a black male on each side of him. He walked back to the white male and he told him to "Get up mother-fucker, get up."
>
> They started walking him towards—on 17th Street towards Kater. He had something shiny in his hand and he was poking him in the back as he was telling him to get up. The two gentlemens that was on the side of him was helping the white male up. They walked him back to—it is a iron gate. They walked him back to this iron gate. The gentleman that had approached it was walking towards me. He put this gun up to the gentleman's head and he shot him.

N.T. of Jan. 22, 1993, at 59–60. She was unable to identify any of the participants. Two cooperating witnesses, Tyrone Mackey and Richard King, placed Reid at Janke's side when Dwayne Bennett killed him. Indeed, in his direct testimony King placed Reid "[a] couple of inches, a couple of feet" from Janke. N.T. of Jan. 21, 1993, at 127. *See also* Commw. Ex. C–3–A.

Reid's defense was that he was not among the three responsible for Janke's death, but was with the others who were not involved in the robbery and shooting. Much examination of the witnesses therefore involved where, precisely, Reid was standing at the time Janke was shot. *See* N.T. of Jan. 21, 1993, at 148–56, 159–61,

192 (King); N.T. of Jan. 22, 1993, at 156, 160, 168, 185–86, 207, 224 (Mackey).

Specifically, after Mackey wrote the initials of the participants and the victim on Commw. Ex. C–4B, he placed Reid and Bennett on either side of the victim, *see* N.T. of Jan. 22, 1993, at 160–62. But even on direct examination, Mackey's testimony regarding Reid was equivocal:

Q. And the next time after you turned your head away from the corner that you looked back was after you had already heard the gunshot; is that correct?

A. Correct.

Q. And at that point, as you've indicated, this is the location of the people as you saw them?

A. Correct.

Q. Giovanni, Carlton, Dwayne, and the man who's being lowered to the ground?

A. Right.

Q. Are you positive of that?

A. I'm positive that that's where I seen Dwayne and I seen figures out of the corner of my eye. I can't be sure exactly how far, but it seemed like a few steps.

Q. Just a few steps away from Dwayne?

A. Yes. Where I've marked it.

Q. And you know Giovanni; correct?

A. Correct.

Q. And you knew it was Giovanni; correct?

A. I turned so quick I never identified.

N.T. of Jan. 22, 1993, at 167.

Indeed, in view of this equivocation, Judge Savitt intervened and the following colloquy took place:

THE COURT: Well, wait a minute.

A. (continued) I turned—

THE COURT: Wait a minute. The three people who you described—

THE WITNESS: Right.

THE COURT: —who were these three people?

THE WITNESS: I can describe Wayne because I looked right at him when I turned, but I turned so quick I seen him out of the corner of my eye. I never actually looked directly at Giovanni or Carlton to see where they were. All I did was hear, "Run, run."

THE COURT: But you saw three people?

THE WITNESS: Correct. I saw—

THE COURT: Do you know—I'm not asking you where you were. Who were the three people?

THE WITNESS: Giovanni, Carlton, and Dwayne.

THE COURT: Is there any question about that?

THE WITNESS: No.

N.T. of Jan. 22, 1993, at 167–68.

Bissinger's report of Reid's trial appeared as part of his depiction of McGovern as one of four people he focused on in *A Prayer for the City*.[4] Somewhat as J. Anthony Lukas did with three families in Boston in his Pulitzer Prize winning *Common Ground,* so Bissinger used these four individuals as paradigms to illustrate the collisions of decency and decay that mark so many American cities. Thus, his account of the *Reid* trial was not written to illuminate anything about the legal process, but was there to show someone whom Bissinger regarded as a "hero of the City" because he worked so zealously to fight the rot of crime.[5] Bissinger's focus was, in every respect, on McGovern and not on the details of Reid's trial except insofar as it showed what McGovern was up against.

Indeed, the four cases reported in detail in the book were there as exemplars of "the story McGovern told always," namely "of a city he had been born in and had grown up in and loved terrorized by a strain of killers who regarded murder as a common and acceptable form of conflict resolution." *Prayer* 83–84. It is in this context that Bissinger reported:

Tyrone Mackey had seen something as well. When McGovern prepped him at lunch right before he was to take the witness stand, he completely reversed his original statement to the police and now said the defendants had been some fifteen feet away from the victim. McGovern got into Mackey's face and stayed there with that scary and schizophrenic street look and warned him that he would be under oath and had better tell the truth.

"I don't get paid enough to get fooled by clowns," he said back in the courtroom, as if he had just been thrown a brushback by some punk minor league pitcher. When Mackey testified, he dropped the fifteen-foot assertion and said the two defendants had been close to Janke that night.

*Prayer* 184.[6]

### The Habeas Hearing

In his testimony of July 22, 2003, Mackey specifically endorsed Bissinger's ac-

---

4. Buzz Bissinger, *A Prayer for the City* (1997). Throughout this memorandum, we shall refer to this 1997 hardbound edition as *"Prayer"*.

5. The account constitutes the bulk of Chapter Ten, entitled "Getting Paid". The trial appears in pp. 176–87 of that chapter. His praise of McGovern is detailed at Hearing Tr. at 76–77.

6. Although defense counsel twice referred to "July 14, 1994 " as his first "backyard reading" of *Prayer,* Hearing Tr. at 6, both counsel

count on page 184. *See* Hearing Tr. at 92. In his own words before us, Mackey described his interaction with McGovern during the luncheon recess as follows:

A. Well, Mr. McGovern asked me to go through, you know, sort of a prep. And so I started gong through it and, you know, telling the story. And as I began telling the story, he stopped me and he said: Well, that's not what you said before.

And I said: Well, this is the way it is.

And I wanted to explain to him the whole course of events of how it came to be the way it was.

And then he became angry. He tensed up. His face turned colors. He got in my face—excuse me. He got in my face and he told me: Go in there, follow the script, and say what I gave the statement to the police as.

He said I'm lucky that I'm not sitting there along with the other two defendants. So go in there and do the job.

Q. Before Mr. McGovern stopped you.

A. Uh-huh.

Q. What had you told him specifically about Giovanni Reid?

A. I told him that Giovanni Reid was not in the vicinity with Dwayne Bennett at the time of the shooting.

I told him—I told him that he had to be at least 15 to 20 feet away from him.

Q. Was it at that moment that Mr. McGovern stopped you?

A. Yes, it was.

Hearing Tr. at 86–88.

On cross-examination, Mackey admitted that he was "lying under oath at the Preliminary Hearing" when he put Reid next to the victim, *see* Hearing Tr. at 85,[7] and that he "lied under oath at the trial", *id.* at 96.

By contrast, McGovern flatfootedly testified that "Tyrone Mackey, as I recall, never said to me that Mr. Reid was 15 feet away from the victim." *Id.* at 107. He did, however, recall Mackey's hesitation:

In any event, what I recall telling—what I recall Mr. Mackey doing was: As he was getting ready to take the Witness Stand, his turning to me and—just like there's a lot of people in the courtroom here. There were a lot of people in the Courtroom that day who were friends, family members of the defendants; who were friends of Mr. Mackey.

And Mr. Mackey turning to me, saying: "What happens if I don't remember?" Or something like: "What happens if I go blank?" Or something like that. Which has happened to me before when witnesses want to go "south;" or they don't want to testify against friends.

And I recall telling Mr. Mackey: "You're under oath. You get up there and you tell the truth. And you have to tell the truth under oath." And that's what I recall happening.

Hearing Tr. at 108.

*Resolving Reid's Claim*

As is by now apparent, Reid's *Brady* claim hangs on the determination of what,

---

later stipulated that the correct year should be 1998.

**7.** Mackey testified at the Sept. 12, 1991 preliminary hearing, and his testimony appears at pp. 7–51 thereof. *See* the Notes of Testimony in *Comm. v. Reed*, MC 91–08–1819 (Mun.

Ct. of Phila., Sept. 12, 1991). He said, "*Right after I heard the gunshot, I turned around. I turned around, Dwayne Bennett was going to the guy on the ground. Carlton Bennett and Giovanni Reed was a couple steps in front of, front—.*" *Id.* at 13.

precisely, was said between McGovern and Mackey during their luncheon recess conversation.[8] Finding out what exactly was said in any conversation is hard enough, but even if one can resolve that question, the issue of a conversation's meaning presents an equally taxing, parallel problem. These difficulties, an everyday experience even between friends and spouses, are perhaps nowhere better illustrated than in Francis Ford Coppola's underviewed classic, *The Conversation*[9], where there was ultimately no doubt as to the precise words exchanged between the couple in question, but the words' meaning was not at all what they first seemed to convey. We will here distinguish a conversation's content from its meaning by referring to the latter enterprise as "Coppola's problem".

### (a) *Evidentiary Standard Under AEDPA*

■ But before we turn to our difficult epistemological problems, we must first consider the threshold evidentiary question Congress interposed when it adopted the Anti–Terrorism and Effective Death Penalty Act of 1996 ("AEDPA").[10] Pertinent to our inquiry here,

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

AEDPA, Pub.L. No. 104–132, § 104(3) (codified at 28 U.S.C. § 2254(d)(2003)).

■ One could reasonably conclude that AEDPA's deferential review regime does not apply here. Specifically, under recent precedent from our Court of Appeals, an argument can be made that we need not defer to the state courts on their determinations of law, but review their determinations of law *de novo*, because a federal claim is not "adjudicated on the merits" under § 2254(d) unless the state court has adjudicated the federal claim *as such*. Put another way, where the petitioner has presented a federal claim, but instead of adjudicating it as a federal claim the state has decided it as a state law claim, the federal claim has *not* been adjudicated on the merits and therefore § 2254 does not apply. As our Court of Appeals phrased it,

> [B]y its own terms § 2254(d) applies only to claims already "adjudicated on the merits in State court proceedings." It follows that when, although properly preserved by the defendant, the state court has not reached the merits of a

---

**8.** Indeed, our first duty under *Strickler v. Greene*, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999) is to determine whether the evidence is favorable to Reid. As an antecedent to that, we must first determine what the evidence was.

**9.** *The Conversation* (Paramount Pictures 1974). Even among the cinemaliterate (though not among Academy Award nominators), *The Conversation* has tended to be overlooked, perhaps because it was released

between *The Godfather* and its first sequel. Loosely based on Hermann Hesse's *Steppenwolf*, Coppola demonstrates in *The Conversation* how a master eavesdropper, Harry Caul, misinterprets the meaning of an entire conversation he surreptitiously recorded between a couple in Union Square, San Francisco. The root of Caul's error, which he ultimately discovers, was the stress on a single word.

**10.** Pub.L. No. 104–132, 110 Stat. 1214 (1996).

claim thereafter presented to a federal habeas court, the deferential standards provided by AEDPA...do not apply. *Appel v. Horn*, 250 F.3d 203, 210 (3d Cir. 2001); *accord Everett v. Beard*, 290 F.3d 500, 507–08 (3d Cir.2002).

As we previously held, the Pennsylvania courts did consider Reid's *Brady* contentions insofar as he complained about undisclosed witness protection program benefits. *See Reid v. Vaughn*, No. 01–2385, 2003 WL 924080, at *1 & nn. 3–4. As to his *Brady* claim about Mackey's statement, however, the Superior Court did not consider it as a *Brady* claim, but instead regarded it as a claim of newly-discovered evidence.[11] Thus, under *Appel* and *Everett*, since the Pennsylvania courts did not adjudicate the Mackey aspect of the *Brady* claim on the merits, we need not defer to their determinations of law and of mixed questions of fact and law.[12]

In another recent case, we concluded that *Appel* and *Everett* seemed to have succumbed to the Supreme Court's decision in *Early v. Packer*, 537 U.S. 3, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002). *Early* appears to hold that as long as a state court adjudicates a claim substantively rather than procedurally—even if it does not identify federal law as the rule of decision—it nevertheless adjudicates the claim on the merits for purposes of AEDPA. *Id.* at 8, 123 S.Ct. 362; *see also Priester v. Vaughn*, No. 02–75, slip op. at 8–9 (E.D. Pa. June 3, 2003).

In the absence of a definitive word from our Court of Appeals, we will for purposes of this aspect of Reid's *Brady* claim assume that we were wrong in *Priester* and that *Appel* and *Everett* remain good law. We shall, therefore, consider the evidence we heard unencumbered by AEDPA's deferential standard of review.

(b) *Weighing the Evidence*

■ After carefully considering the testimony of McGovern, Mackey, and Bissinger, we find major defects in each source. In the case of Mackey, he admitted to us that he had perjured himself both at Reid's trial and at the preliminary hearing that preceded it. *See* Hearing Tr. at 85 and 96. In the case of McGovern, while he repeatedly testified that, "I don't know—it's ten years ago",[13] he claimed a detailed memory of one moment of this highly contentious, high-profile case, and that just happened to be the colloquy with Mackey, *Brady*-sanitized.[14] Bissinger, for his part,

11. Indeed, respondents, in their Post–Hearing Memorandum of Law at 2–8, largely defend the Pennsylvania courts' decisions here on the basis that, as the Superior Court held, the newly-discovered evidence would not have made a difference to Reid's second degree murder conviction. While there is, to be sure, much force in the Commonwealth's contentions on this point, we cannot blind ourselves to the fundamental fact that it elected to prosecute three of the six gang members, and did so on the basis of proximity to the victim. Further, we credit Mr. Wallace's testimony that, at a minimum, the disclosure of the fifteen-foot distance would have given him a bargaining point to negotiate a guilty plea for a lesser degree of homicide.

In short, it seems to us the better part of valor to avoid this thicket when the direct approach we take essentially comes to the conclusion that respondents seek here, and does so definitively.

12. Indeed, since the Pennsylvania courts also did not consider the question of Mackey's statement *and* the witness protection program benefits as a unit constituted a *Brady* violation, one could argue that the entire *Brady* claim should be reviewed *de novo*.

13. *See, e.g.,* Hearing Tr. at 123, 131 ("I don't remember all the evidence to tell you the truth."), 132, 135, 146 ("I don't remember what I said 10 years ago.").

14. It is important to underscore here that, however significant this trial was, it was but one of about 300 homicide cases McGovern

admitted that he was not present during the conversation, but probably talked about it with McGovern at the end of the day's proceedings.[15] Bissinger was, therefore, in no position to see what he described as "that scary and schizophrenic street look" on McGovern's face. *Prayer* at 184.[16]

There is, however, a thread that links all three accounts, and that is that Mackey was a reluctant witness who surprised McGovern during the mid-trial luncheon prep session, or possibly immediately before he began his testimony, by conveying to McGovern the possibility that he would suddenly not recall the events as McGovern expected he would. Since there was no recording of what was actually said,[17] we cannot know the precise words of a conversation that took place ten and a half years ago.

If, however, we consider Coppola's problem, our task actually becomes easier. There seems little dispute that (a) Mackey expressed hesitation in some form, and (b) McGovern responded unhappily at this unpleasant surprise, coming, as it did, at the most inconvenient time possible. We therefore reject McGovern's suggestion that there was even a possibility that he

---

tried. This staggering number alone explains why McGovern would have a hard time remembering any particular case from ten years ago.

McGovern's testimony stretched credulity regarding his reaction to Bissinger's account of his conduct in *A Prayer for the City*. Although McGovern is one of four citizens who are the focus of the book—and, indeed, Bissinger testified that he regards McGovern as "one of the heroes of the City"—McGovern claimed that the only content he paid attention to in the book were the references to then-Mayor Rendell. Hearing Tr. at 149–50. Specifically, McGovern admitted that he never called any inaccuracies to Mr. Bissinger's attention, spoke with Bissinger between twenty-five and thirty times, but claimed that he did not pay any attention to the references to himself and his wife in the book. We saw nothing in McGovern's demeanor that would confirm the existence of such Franciscan self-abnegation.

**15.** Bissinger admitted that "I was not privy to the actual conversation." Hearing Tr. at 55. He was also "clear" that he did not get the information from Tyrone Mackey. *Id.* at 55–56. His only source was therefore McGovern, who reported it to Bissinger some time "as the trial was progressing," *id.* at 58, although it could have been "[i]n the Courtroom; or over the telephone; [or] in his [McGovern's] office," *id.* at 63. On cross-examination, Bissinger admitted that when he quoted McGovern from the actual *Reid* trial transcript, he reproduced sentences as consecutive that in truth were actually separated by words

Bissinger elected to edit out, without supplying ellipses. *Id.* at 67–68. In short, as respondents put it pithily, this record "shows that *Bissinger is not a scrivener.*" Resp's Post–Hrg. Mem. of Law at 10.

We without objection received Bissinger's testimony, and the book excerpt, as extrinsic evidence of a prior inconsistent statement under Fed.R.Evid. 613(b). *See* 4 Jack B. Weinstein et al., Weinstein's Federal Evidence § 613.05[1] & n. 2 (2d ed.2001); *see also United States v. Winchenbach*, 197 F.3d 548, 558 (1st Cir.1999) (holding that extrinsic evidence of a prior inconsistent statement is admissible "not to demonstrate which of the two [statements] is true but, rather, to show that the two do not jibe (thus calling the declarant's credibility into question)"). In the exercise of our discretion, we used the account on page 184 of *A Prayer for the City* and Bissinger's oral testimony in order to measure the credibility of the two participants in the conversation. In his post-hearing brief, Reid claims that "Mr. Bissinger's testimony of what Mr. McGovern told him is not hearsay and is admissible as an admission by a party opponent, since Mr. McGovern was an agent of the respondent ... when he made the statement," Pet.'s Br. at 2–3. We need not parse these interesting evidentiary questions, as we have added Bissinger's account into the *Rashomon* mix.

**16.** Indeed, McGovern objected to those adjectives. Hearing Tr. at 142.

**17.** Much less three of them as in *The Conversation*.

could have reacted to McGovern's hesitation with calm equanimity.

We know from unnumbered criminal trials, and from McGovern's own mouth,[18] that prosecutors at trial are intimately familiar with all prior statements of cooperating witnesses. This familiarity is especially intimate when such statements are under oath. Although McGovern was not the Assistant District Attorney at Reid's preliminary hearing, McGovern admitted that he was, at the time of Reid's trial, familiar with the preliminary hearing transcript. It is therefore easy to conclude that McGovern indeed used the word "script" that Mackey attributed to him— but which McGovern did not represent to Bissinger—and the "script" to which McGovern referred was the one Mackey himself "wrote" in his preliminary hearing testimony. We infer that McGovern, doubtless with profound agitation, called Mackey's attention to the "script" of the preliminary hearing notes of testimony, reminded him that he was then under oath and would again be under oath in moments, and told him to be consistent, stressing that this was indeed a "script" that Mackey himself had (as it were) written.

While, to be sure, this reconciliation of the testimony is incomplete in that it is not a verbatim account of all the words actually said—a hopeless *Rashomon* problem for any finder of fact—it nevertheless uses key elements in the testimony that, for us, leaves little doubt as to the solution to Coppola's problem. That solution is simply that McGovern, obviously very frustrated, called upon Mackey to recall *Mackey*'s sworn testimony, and therefore put not a single word into Mackey's mouth.

At argument after the evidentiary hearing, Reid's counsel conceded that if we were to reconcile the testimony this way, there would be no *Brady* violation. *See* Hearing Tr. at 169. While he hesitated in this concession if the assumption were that McGovern was "beet red" when he reminded Mackey of the "script", Reid's counsel retreated when we suggested that constitutional consequences should not flow from the shade of flush on a prosecutor's face. *Id.*

We therefore hold that our first inquiry under *Strickler v. Greene* must be resolved against Reid. The evidence in question was innocuous, and not favorable to this defendant.

■ Our conclusion does not change if we add to the *Brady* mix the undisclosed benefits Mackey and King received. It will be recalled, first of all, that this aspect of the *Brady* claim *was* "adjudicated on the merits" in the Pennsylvania courts, against Reid. AEDPA's deferential review therefore applies. Against that standard, we cannot hold that the Superior Court's decision "involved an unreasonable application of [ ] clearly established Federal law [ ] as determined by the Supreme Court of the United States." In summary, the Superior Court held:

> The evidence pertains to the housing and feeding arrangements of two key Commonwealth witnesses, Mackey and King, from August 21, 1991 until October 9, 1991, nearly two years before trial. Due to threats made against Mackey and King, the Commonwealth placed them in the witness protection program in order to secure their safety and ensure their testimony at the *preliminary hearing*. There is no evidence of record, nor assertion made by Appellant, that these witnesses were paid or

---

**18.** *See* Hearing Tr. at 117, where McGovern told us that he had the Notes of the Preliminary Hearing, which are always "an essential tool to prepare for trial."

housed following the preliminary hearing, or that they received benefits in exchange for their testimony *at trial.*

\* \* \* \* \* \*

Information regarding the accommodations received by Mackey and King would only have disclosed the fact that threats were made against them by Appellant, Appellant's brother, and others on Appellant's behalf, ... and would have been counterproductive to Appellant's defense.... In fact, Mackey testified at the PCRA hearing that he disliked the witness protection program and attempted to leave, only to return five days later for fear of his life.... Further, as the trial court correctly observed, defense counsel vigorously cross-examined King and Mackey, and the detailed descriptions given by the two witnesses of how the crime occurred were further corroborated by the testimony of an unrelated bystander to the incident, Lorraine Hill. Based on the aforementioned, Appellant has failed to establish how the evidence is material under *BRADY.*

*Commonwealth v. Reed, supra* note 2, at 8–9, 742 A.2d 1150 (citations and footnotes omitted).

Reid's *Brady* claims thus do not withstand careful scrutiny, and we therefore reject them.

### ORDER

AND NOW, this 27th day of August, 2003, upon consideration of Giovanni Reid's petition for a writ of habeas corpus, and the Report and Recommendation of the Honorable Diane M. Welsh, and defendant's objections thereto, and after a hearing on July 22, 2003, and further briefing from the parties, and upon this Court's Memoranda of March 4, 2003, May 2, 2003 and this day ("the Memoranda"), it is hereby ORDERED that:

1. Petitioner's objections to the Report and Recommendation of Magistrate Judge Diane M. Welsh are OVERRULED except to the extent considered in the Memoranda cited above;

2. The petition for a writ of habeas corpus is DENIED WITH PREJUDICE; and

3. Petitioner having made a substantial showing of the denial of his constitutional rights under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), we ISSUE a certificate of appealability limited to those claims.