**UNITED STATES of America**

v.

**Ralph WINCHENBACH, Jr., Defendant.**

**Criminal No. 98–38–P–C.**

United States District Court,
D. Maine.

Oct. 27, 1998.

---

Jonathan R. Chapman, Asst. U.S. Atty., Office of U.S. Atty., Portland, ME, for U.S.

Mary A. Davis, Tisdale & Davis, Portland, ME, for Defendant.

## MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

GENE CARTER, District Judge.

Defendant Ralph Winchenbach, Jr. faces a charge of intentional distribution of a controlled substance containing cocaine in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2. Indictment (Docket No. 1). Now before the Court is Defendant's Motion to Suppress (Docket No. 9). In that motion, Defendant asks this Court to suppress as evidence in this case any evidence obtained as a result of his arrest and as a result of a search of his person at the time of his arrest. After reviewing counsels' memoranda, hearing argument, and reviewing the stipulated record, the Court concludes that Defendant's motion should be denied.

### I. BACKGROUND

The following facts are gathered from the evidentiary record stipulated to by the parties for purpose of the Court's consideration of the pending motion to suppress evidence. Stipulated Record (Docket No. 13). On September 3, 1997, at approximately 11:00 p.m., law enforcement agents arrested Defendant at his mobile home on Ralph Wink Road in Waldoboro, Maine. *Id.* At the time of Defendant's arrest, the officers were executing a search warrant for Defendant's premises and did not possess a warrant for his arrest. *Id.*

According to the record, agents of the Maine Drug Enforcement Unit of the Maine Department of Public Safety had surveilled four controlled buys of cocaine by a wired informant from Wendy Spinney, the original target of a drug distribution investigation. Stipulated Record, Exhibit B at ¶¶ 2–6. The officers observed Spinney traveling in the direction of Ralph Wink Road where Defen-

dant resides when Spinney went to collect the cocaine for each purchase. *Id.* at ¶¶ 1–6. Specifically, during one controlled buy, the officers observed Spinney going directly to Defendant's mobile home to purchase the cocaine. *Id.* at ¶ 3. Upon their arrest, Spinney and William Holmstrom, Jr. who accompanied Spinney to collect the drugs, provided police with information that reasonably identified Defendant as the source of the cocaine. *Id.* at ¶¶ 7–8. The facts revealed from the investigation are set forth in detail below.

At the end of April 1997, agents supervised the first controlled buy from Spinney. The informant was equipped with a body wire, given $250 of recorded money, and searched for contraband. *Id.* at ¶ 1. The informant called Spinney and arranged to meet at the Oyster Shell Motel to purchase cocaine. At the motel the informant spoke to Spinney and an unidentified male about purchasing some cocaine. *Id.* Spinney told the informant she was going to Rockland to get the cocaine and that he should come back later to pick it up.[1] *Id.* Despite the fact that Spinney mentioned that she would pick the cocaine up in Rockland, Spinney and the male were followed by the officers on Route One northbound toward Duck Puddle Road in Waldoboro which leads to Ralph Wink Road.[2] *Id.; See* Map of Duck Puddle, Appendix A. The officers continued to follow Spinney to Ralph Wink Road.[3] *Id.* Stipulated Record, Exhibit B at ¶ 1. The suspects were gone for about ten minutes before they were seen returning on Duck Puddle from the direction of Ralph Wink Road. *Id.* They were followed back to the motel, wherein they gave the informant an unknown amount of cocaine. *Id.*

On May 30, 1997, a similar transaction transpired. This time, the agents recorded the informant and Spinney making arrangements for a purchase of cocaine. *Id.* at ¶ 2. Spinney told the informant to come to her house. *Id.* The informant was equipped with a body wire, given $250 of recorded money and searched for drugs. *Id.* After

meeting with the informant at her house, Spinney again told the informant that she would pick up the cocaine from Rockland. *Id.* An agent followed Spinney on Route One northbound onto Duck Puddle Road in the direction of Ralph Wink Road. *Id.* Spinney was seen on Duck Puddle Road coming from the direction of Ralph Wink Road approximately ten minutes later. *Id.* Spinney returned home, called the informant, and informed him that she could not get the cocaine from Rockland and that the people in Waldoboro were out. *Id.*

Again, on June 5, 1997, the informant called and arranged to buy an "eight ball" of cocaine from Spinney with marked bills. This time Spinney told the informant that she would go to Waldoboro to get the cocaine. *Id.* at ¶ 3. The informant was again equipped with a body wire, given $250 of recorded money, and driven by officers to Spinney's house. *Id.* The surveilling officer heard Spinney and the informant discuss the purchase of cocaine. *Id.* The informant reported that Spinney told the informant she gets the cocaine from a "Junior" in Waldoboro. Spinney was then followed by an officer to Defendant's mobile home on the Ralph Wink Road in Waldoboro. *Id.* Spinney entered the mobile home and remained inside for ten minutes. *Id.* Spinney was followed back to her home and was inside for seven minutes before the informant arrived to pick up the cocaine. When the informant exited Spinney's home, he had an "eight ball" of cocaine on his person. *Id.*

Finally, on September 3, 1997, the informant, who again was wired, provided with $250 of marked bills, and searched for contraband, arranged to purchase cocaine from Spinney for the last time. The informant arranged to meet Spinney at her home to give her the money for the drugs. *Id.* at ¶ 4. Spinney told him that she would pick up the cocaine from Duck Puddle and that they were waiting for her at "Junior's" house. *Id.* A law enforcement officer drove the infor-

---

1. According to the stipulated record, Spinney has purchased cocaine in Rockland on several occasions. Stipulated Record, Exhibit C at ¶ 12.

2. The Court notes that, traveling along Route One, Rockland is located approximately 15 miles north of Waldoboro.

3. Ralph Wink Road is not a through street.

mant to Spinney's home. *Id.* at ¶ 5. At Spinney's home, the informant arranged with Spinney and a man, later identified as William Holmstrom, Jr., to meet at Houston Dodges—a local junkyard. Spinney and Holmstrom then left to pick up the cocaine. *Id.* Spinney and Holmstrom were followed north on Route One to the intersection with Duck Puddle Road, where they turned down toward Ralph Wink Road. *Id.* After approximately ten minutes of waiting, a detective observed Spinney returning down Duck Puddle Road from the direction of Ralph Wink Road. *Id.* He continued to follow them south on Route One until police stopped them. Both Spinney and Holmstrom were searched, and an "eight ball" of cocaine and $50 of the marked bills were seized. *Id.*

In the hopes of gaining consideration for cooperation on their charges, both Spinney and Holmstrom cooperated during questioning with police at the Lincoln County Jail.[4] After being read her *Miranda* rights and indicating she understood her rights, Spinney told law enforcement agents that she had bought the cocaine seized at the time of her arrest, from "Junior Winchenbach" immediately prior to her arrest. *Id.* at ¶ 7. When asked whether Junior Winchenbach was Ralph Winchenbach, Spinney stated that she thought so. *Id.* Spinney told officers that she had used $200 of the informant's money to purchase the cocaine. *Id.* She also told police that she had bought cocaine from Winchenbach about thirty times and each time went to his home. *Id.* Holmstrom told detectives that he had gone with Spinney to Ralph Wink Road in Waldoboro to pick up the cocaine. *Id.*

Shortly thereafter MDEA agents applied for a search warrant for Defendant's home.[5] The Affidavit and Request for the Search Warrant stated that the police had probable cause that drug trafficking evidence would be found in Defendant's residence and in "[a]ny and all people present and arriving at the residence at the time of the search, including but not limited to Ralph Winchenbach Jr. and Arlene Winchenbach."[6] Stipulated Record, Exhibit B at 1. Based upon the above information, the agents obtained a search warrant for Defendant's home on Ralph Wink Road in Waldoboro from Maine District Court.[7] The warrant did not provide for the arrest of Defendant.

Later in the evening of September 3, 1997, law enforcement agents went to Defendant's mobile home on Ralph Wink Road in Waldoboro to execute the search warrant. When Defendant came to the front door, police immediately arrested him for trafficking in cocaine.

## II. DISCUSSION

Defendant moves to suppress the evidence found upon the search of his person incident to his arrest. Defendant argues that, because he was arrested at home, federal law requires an arrest warrant. Furthermore, even if a warrant is not required, the officers lacked probable cause to arrest him. This Court will address the following legal issues identified by the parties: (1) whether the officers had probable cause for Defendant's arrest and (2) whether the Defendant's arrest was unlawful because it was without a warrant.

### A. Probable Cause To Arrest

Defendant argues that the officers lacked probable cause to arrest him because the information from the ongoing investigation of Spinney was not sufficient to warrant the belief that Defendant had distributed co-

---

4. At the time of questioning, Spinney and Holmstrom had not been given any promise or guarantee about charges against them.

5. According to the stipulated record, the mobile home that was searched pursuant to the warrant was lived in at one time by Dale Winchenbach, who is a known cocaine user. Stipulated Record, Exhibit D at ¶ 5. However, according to the record Defendant lived in the premises when the warrant was executed. Stipulated Record, Exhibit B at ¶ 3. Defendant does not dispute that he

resides in the mobile home named in the search warrant.

6. The warrant names "Arlene Winchenbach." However, according to the stipulated record, an Arlene Jones, who was once married to Gene Winchenbach—Defendant's brother, resides in the mobile home with Defendant.

7. Defendant does not challenge herein the issuance of the search warrant.

caine. The Government counters that probable cause for Defendant's arrest is supported by the facts of the investigation as set forth in the stipulated record. The Court agrees with the Government.

■ The constitutionality of a warrantless arrest is determined under the probable cause standard. *Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 225–26, 13 L.Ed.2d 142 (1964). The United States Supreme Court has repeatedly declined to announce any bright-line test to determine the presence of probable cause in any given case. This reluctance reflects the Court's view that probable cause is a "practical, nontechnical conception," *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949), and that "the evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement." *United States v. Cortez*, 449 U.S. 411, 418, 101 S.Ct. 690, 695, 66 L.Ed.2d 621 (1981). The Supreme Court has also noted that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts." *Illinois v. Gates*, 462 U.S. 213, 232, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). Whether an arrest is constitutionally valid depends upon whether, at the moment the arrest was made, the officers had probable cause to make it— "whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck*, 379 U.S. at 92, 85 S.Ct. at 226. A probable cause determination, therefore, is fundamentally a fact-specific inquiry, and every case must be evaluated on its own facts and circumstances with due consideration to the totality of all the circumstances in that particular case. *United States v. Khounsavanh*, 113 F.3d 279 (1st Cir.1997).

■ Taking into account the totality of the circumstances in the instant case, the officers were reasonable in their belief that Defendant had distributed cocaine and, hence, had probable cause for his arrest. The investigation leading up to the arrest that evening included surveillance that corroborated information provided by a wired informant and an arrested suspected cocaine trafficker, identifying Defendant as the source for the cocaine. On June 5, 1997, the wired informant arranged to purchase cocaine from Spinney, who informed him she would pick up the drugs in Waldoboro. An officer followed Spinney, who went directly to Defendant's mobile home, where she remained for approximately ten minutes. Spinney returned to her home and gave the informant cocaine after remaining in her home for only seven minutes. In the other controlled buys, although the agents did not see Spinney enter Defendant's home, they followed her to Defendant's neighborhood where cocaine was obtained.

Furthermore, the officers had reasonably trustworthy information that identified Defendant as the person from whom Spinney purchased cocaine. On May 30, 1997, after an unsuccessful attempt at purchasing cocaine, Spinney told the informant that the people in Waldoboro were out. Stipulated Record, Exhibit B at ¶ 2. On June 5, 1997, Spinney told the informant that she purchased the cocaine from "a Junior" in Waldoboro. *Id.* at ¶ 3. On September 3, 1997, Spinney told the informant they were waiting for them at "Junior's" home. *Id.* at ¶ 4. Finally, Spinney told police that she had bought the cocaine seized upon her arrest from "Junior Winchenbach," whom she believed to be Defendant. *Id.* at ¶ 7. Furthermore, Holmstrom, when arrested along with Spinney, told police that he had gone with Spinney to Ralph Wink Road to pick up the cocaine. *Id.* at ¶ 9.

Defendant argues that the facts in this case are indistinguishable from facts in *United States v. Khounsavanh*, 113 F.3d 279 (1st Cir.1997), which the court concluded were not particularized enough to provide officers with probable cause to search the defendant. In *Khounsavanh*, the government obtained a warrant to search an apartment and a person, not the defendant, who resided in the apartment. The defendant challenged the officer's search of his person without a warrant. The warrant was based on the following: information from an unverified infor-

mant that persons named "Fat Boy" and "Turtle" were storing and selling drugs in an apartment located in a three-story tenement building and an observed controlled buy where the informant went into the apartment building without crack cocaine and emerged several minutes later with crack cocaine, explaining that he had purchased the drugs from "Fat Boy." *Id.* at 285–86. The First Circuit found that the controlled buy was less than ideal because, although the detective watched the informant enter and leave the building through its front door, he did not follow the informant into the building and could not verify with certainty which apartment was the source of the drugs. *Id.* The court determined that, "the factors discussed, while providing probable cause to believe that the premises contained contraband or evidence of a crime, do not alone provide a sufficient basis for the police to have searched this defendant's person." *Id.* at 287. Therefore, the controlled buy in *Khounsavanh,* where the detective observed the informant enter the building but not the apartment believed to be rented by defendant, was not sufficient evidence to provide probable cause that defendant would have drugs on his person.

Defendant argues that the controlled buys observed in this case, similar to those in *Khounsavanh,* are not sufficient evidence to warrant a reasonable person to believe that Defendant provided Spinney with cocaine. This Court disagrees. Here, on two of the four controlled buys, police officers only observed Spinney drive on Route One north as far as the intersection with Duck Puddle Road and although did not follow Spinney directly to Defendant's residence on Ralph Wink Road, Spinney was seen driving in the general direction of Ralph Wink Road. This is the same general imperfection from which the controlled buy in *Khounsavanh* suffered and arguably alone is not sufficient evidence to support probable cause. Just as the police officers in *Khounsavanh* failed to follow the informant into the building to see exactly in which apartment the informant purchased the cocaine, the police in these controlled

buys did not observe from which home in the Duck Pond neighborhood Spinney purchased the cocaine.

Here, however, officers were not merely relying on the fact that Defendant resided in the general neighborhood where Spinney was suspected of picking up the drugs. On the controlled buy that occurred at the end of April, the officers observed Spinney drive down the Ralph Wink Road and on the controlled buy on June 5, 1997, officers followed Spinney directly to Defendant's mobile home on Ralph Wink Road in Waldoboro. For the later drug transaction, the officer observed Spinney go into Defendant's mobile home and remain there for approximately ten minutes and then return to her home, where she remained alone for only seven minutes before the informant arrived to pick up the cocaine. This, coupled with the information that reasonably identified Defendant as the occupant of the mobile home, is sufficient evidence on which a reasonable officer could rely in believing that Defendant supplied the cocaine.

Defendant presents the following evidence, gathered by a private investigator, in the hope of showing that the officers' belief that Defendant had supplied the drugs was unreasonable. First, Defendant asserts that a timed drive from Route One to Ralph Wink Road at 40–45 miles per hour took approximately seven minutes one way. Stipulated Record, Exhibit E at ¶ 2. Defendant contends that because this distance takes seven minutes to travel one way, Spinney could not possibly have gone to Defendant's home to pick up the cocaine on the days the officers followed Spinney to the intersection of Route One and Duck Puddle Road and she returned in ten minutes. Second, Defendant demonstrates that Ralph Wink Road is populated almost entirely by the Winchenbach family. *Id.* at ¶¶ 6–12. His contention is that Spinney may have purchased the drugs from one of the other Winchenbach siblings, of which there are twelve. This is further supported by the fact that Spinney testified before the grand jury that she had once purchased drugs from Alan Winchenbach.[8] *Id.* at ¶ 11.

---

**8.** Defense counsel argued that another Winchenbach may have been involved with cocaine distribution as well. However, this assertion is not supported by the record and will not be given weight in this determination.

Third, Defendant points out that Holmstrom's mother and former girlfriend, with whom he often visits, live on Duck Puddle Road. Id. at ¶ 5. Defendant contends that Spinney and Holmstrom may have gone to either of these addresses when they went to pick up the drugs and·suggests that Spinney was lying when she identified Defendant as the source of the drugs.

Defendant contends that this evidence demonstrates that the "junior" referred to by Spinney as the source of cocaine could arguably be Holmstrom, who is also a junior. However, the totality of the evidence gathered prior to the arrest does not substantiate that it was Holmstrom. None of this evidence in the stipulated record disputes the fact that, on June 5, 1997, officers followed Spinney directly to Defendant's mobile home during the controlled buy. Stipulated Record, Exhibit B at ¶ 3. Furthermore, this evidence does not change the fact that Spinney told police she believed the "Junior" she was purchasing drugs from was Ralph Winchenbach, Jr. Id. at ¶ 7. There is no assertion that any other Winchenbach is also a junior. In addition, neither Holmstrom's mother nor girlfriend told Defendant's investigator that Spinney and Holmstrom visited them on the dates in question.

In short, the information available to agents at the time of the arrest on September 3, 1997, indicated that Defendant was providing cocaine to Spinney, and police were reasonable in this belief. Thus, the Court finds that on September 3, 1997, the officers had sufficient reasonably trustworthy information to warrant a prudent man in believing that Defendant had committed the offense of distributing a controlled substance containing cocaine. Accordingly, Defendant's arrest was supported by probable cause.

### B. Warrant Requirement

█ Having determined that Defendant's arrest was supported by probable cause, the Court must now address Defendant's contention that his arrest was unlawful because the officers lacked a warrant. Defendant contends that his arrest was invalid because the officers did not obtain an arrest warrant. He rests his argument on the Supreme Court's decision in *Payton v. New York*, 445

U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *Payton*, police officers without either a search or arrest warrant entered a suspect's home intending to arrest him. The Supreme Court invalidated the arrest and held that the Fourth Amendment prohibits police officers from making warrantless and nonconsensual entries into suspects' homes to make routine felony arrests. Defendant asserts that *Payton* establishes a *per se* rule that all arrests made in the home without an arrest warrant are invalid and that the evidence seized pursuant to such a warrantless arrest must be suppressed. Defendant ignores the basic premise upon which the *Payton* decision, as well as subsequent case law rests. Under the facts of this case, the Court concludes that the arrest, made while officers were legally on premises pursuant to a search warrant, did not require a separate arrest warrant.

The Supreme Court in *Payton* answered the narrow question of whether, absent exigent circumstances but with probable cause to arrest, police officers could enter a person's home to effect an arrest of that person without any warrant. Essentially, the question was whether an arrest in a home should be afforded the same protection as a search in the home and, thus, requires a warrant. The law at the time *Payton* was decided, as it is today, was well settled that searches and seizures inside a home without a warrant are presumptively unreasonable and unlawful unless police can show exigent circumstances. *Payton*, 445 U.S. at 587, 100 S.Ct. at 1380. The Court determined that the distinction between seizure of property without a warrant in a public place and seizure of property without a warrant in the home "has equal force when the seizure of a person is involved." *Id.* The distinction for both rested on the premise that both intrusions share the same fundamental characteristic: "the breach of the entrance to an individual's home." *Id.* at 589, 100 S.Ct. at 1381 ("In none is the zone of privacy more clearly defined than when bounded by the unambiguous physical dimensions of an individual's home— a zone that finds its roots in clear and specific constitutional terms."). The Court held that, because both arrests and searches in a

home involve the same intrusion when conducted without a warrant, the Fourth Amendment requires a warrant for a routine home arrest as it does for a search.

The *Payton* rule was designed to protect the physical integrity of the home. *Payton,* 445 U.S. at 585, 100 S.Ct. 1371 ("Physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."); *see also New York v. Harris,* 495 U.S. 14, 17, 110 S.Ct. 1640, 1643, 109 L.Ed.2d 13 (1990) ("our holding in [the *Payton*] case stemmed from the 'overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic' "). The wrong cured by the *Payton* decision lies not in the arrest, but in the unlawful entry into a person's home without proper judicial authorization. *See Id.;* 3 W. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment,* § 6.1(c) at 249 (3d ed.1996) (it is the otherwise unauthorized entry and not the arrest which gives rise to the warrant requirement). The Court in *Payton* reasoned that the arrest warrant cured this wrong because it carries with it the "limited authority to enter a dwelling in which [a] suspect lives when there is reason to believe the suspect is within." *Payton,* 445 U.S. at 603, 100 S.Ct. at 1388.

■ It does not follow from the *Payton* rule that an arrest warrant is required if the police possess a search warrant. A search warrant represents a judicial determination that there is probable cause to invade the privacy of the suspect's home. *Jones v. City and County of Denver Colorado,* 854 F.2d 1206, 1209 (10th Cir.1988). If an officer is lawfully present in the dwelling, "the breach of an individual's home" prohibited by *Payton* has not occurred and the arrest is lawful provided there is probable cause. *Jones,* 854 F.2d at 1209; 3 *Search and Seizure,* § 6.1(c) at 249 (warrantless arrest within premises is

permissible when the prior entry was gained by executing a search warrant for physical evidence). Thus, if police officers are lawfully on the premises pursuant to a judicially obtained search warrant, they have not unlawfully crossed the threshold of a person's home and committed the "breach of an individual's home." It follows that if the police are lawfully in a suspect's home under a search warrant, they may arrest him or her if they have probable cause.

Although there is a surprising lack of judicial decisions on this issue, other federal courts have reached the same conclusion that this Court reaches here. In *Jones v. City and County of Denver Colorado,* the Tenth Circuit rejected the appellant's contention that his arrests were invalid because the officers did not obtain arrest warrants and held that, because the officers had a search warrant, the arrest inside the home was constitutional. 854 F.2d 1206, 1209 (10th Cir. 1988). The court reasoned that because the "impartial determination that supports the issuance of a search warrant justifies a greater intrusion than that supporting the issuance of an arrest warrant," once an officer has procured a search warrant, the privacy interests safeguarded by the Court in *Payton* have been protected. *Id.; see also Mahlberg v. Mentzer,* 968 F.2d 772, 774–75 (8th Cir. 1992), (holding that because "the officers were lawfully in [appellant's] home to search," his arrest did not extend the scope of duration of the search in any way), *cert. denied* 506 U.S. 1026, 113 S.Ct. 670, 121 L.Ed.2d 593 (1992).[9]

Here, the officers were lawfully in Defendant's home pursuant to a judicially authorized search warrant. The search warrant authorized the officers to search the premises of Defendant for evidence relating to the distribution of controlled substances. Defendant has not challenged the sufficiency of the warrant or its execution. Thus, the officers

---

9. A number of state courts have also held that a warrantless arrest within premises is permissible when the prior entry was gained by executing a judicially valid search warrant for physical evidence. *State v. Ruth,* 181 Conn. 187, 435 A.2d 3 (1980); *The People v. Battista,* 197 A.D.2d 486, 602 N.Y.S.2d 865 (N.Y.A.D.1993); *People v. Edwards,* 144 Ill.2d 108, 161 Ill.Dec. 788, 579 N.E.2d 336 (Ill.1991), *cert. denied,* 504 U.S. 942, 112 S.Ct. 2278, 119 L.Ed.2d 204 (1992); *State v. Dye,* 250 Kan. 287, 826 P.2d 500 (Kan.1992), *rev. on other grounds,* 48 F.3d 487 (10th Cir.1995); *State v. Galde,* 306 N.W.2d 141 (Minn.1981); *State v. Ware,* 219 Neb. 594, 365 N.W.2d 418 (Neb.1985); *Ludwig v. State,* 97 Nev. 445, 634 P.2d 664 (Nev.1981).

were lawfully in Defendant's home when they arrested him. Defendant's argument that his arrest was unlawful because the officers arrested him without a warrant, therefore, fails. This Court holds that because the officers were lawfully present in Defendant's home when they arrested him without an arrest warrant, the arrest at Defendant's home was not unlawful. Therefore, because the officers were lawfully in Defendant's home at the time of the arrest and the arrest of Defendant was supported by probable cause, Defendant's Motion to Suppress will be denied.

## III.  CONCLUSION

Accordingly, the Court **ORDERS** that Defendant's Motion to Suppress be, and it is hereby **DENIED.**

APPENDIX A

LEGEND

- ▫ Geo Feature
- ˙ Population Center
- —— Street, Road
- ▪ Major Street/Road
- ═══ State Route
- ═══ US Highway
- —— River
- ▭ Open Water

Scale 1:37,500 (at center)

├─2000 Feet─┤

├─1000 Meters─┤

Ralph Wink Road, Waldoboro, M
Mag 14.00
Wed Oct 14 15:55:16 1998

MAP OF DUCK PUDDLE