USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 99-1202

 UNITED STATES OF AMERICA,

 Appellee,

 v.

 RALPH WINCHENBACH, JR.,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. Gene Carter, U.S. District Judge]

 Before

 Selya, Circuit Judge,
 
 Coffin, Senior Circuit Judge,
 
 and Stahl, Circuit Judge.
 
 
 
 Mary A. Davis, with whom Tisdale & Davis, P.A. was on brief,
for appellant.
 F. Mark Terison, Senior Litigation Counsel, with whom Jay P.
McCloskey, United States Attorney, was on brief, for appellee.

December 2, 1999

 
 

 SELYA, Circuit Judge. This appeal raises two important
issues. One requires us to determine for the first time whether
the police, equipped with a search warrant but not an arrest
warrant, may enter the home and immediately arrest a resident on
the basis of previously acquired probable cause. The second
requires us to plot the line of demarcation between two closely
related but poorly understood rules of evidence, Fed. R. Evid.
608(b) and Fed. R. Evid. 613(b). Concluding, as we do, that the
arrest and the search conducted incident thereto were
constitutionally permissible and that the trial court's admission
of the challenged extrinsic evidence passes muster, we affirm the
judgment of conviction.
I. BACKGROUND
 We offer only a synopsis of the evidentiary record,
borrowing liberally from the district court's more detailed
rendition. See United States v. Winchenbach, 31 F. Supp. 2d 159,
160-62 (D. Me. 1998). We later supplement our account in the
course of discussing specific assignments of error. 
 Over a period of approximately five months in mid-1997,
the Maine Drug Enforcement Agency (MDEA), working in concert with
a confidential informant named James Holmes, fomented a series of
"controlled" drug transactions. The first occurred in April. 
Acting on the MDEA's instructions, Holmes gave Wendy Spinney (a
target of the probe) $250 in exchange for Spinney's promise to
deliver cocaine. Although Spinney told Holmes that she would
procure the cocaine in Rockland, agents followed her to the Ralph
Wink Road, a dead-end street in Waldoboro. She disappeared for a
brief interval, but the agents then spied her returning from the
Ralph Wink Road and trailed her to a motel (where she delivered the
cocaine to Holmes).
 On May 30, Holmes called Spinney to arrange another
purchase. He then went to her abode and gave her $250. Although
Spinney again told Holmes that she would go to Rockland to obtain
drugs, agents followed her to Duck Puddle Road (a street leading to
Genther Road, which accesses the Ralph Wink Road). A short time
later, the agents spotted her coming from the direction of the
Ralph Wink Road. Upon returning home, Spinney called Holmes and
informed him that she could not get any cocaine.
 On June 5, Holmes again called Spinney and arranged to
buy an "eight-ball" of cocaine. He visited her residence as was
typically the case, the MDEA chauffeured him there and in the
ensuing conversation, Spinney identified her supplier as "Junior"
and specified that he was based in Waldoboro. This time, the
agents tracked Spinney to a trailer on the Ralph Wink Road in which
defendant-appellant Ralph Winchenbach, Jr. resided with his quondam
paramour, Arlene Jones (formerly Arlene Winchenbach, by virtue of
her earlier marriage to one of the appellant's brothers). Spinney
spent nearly ten minutes inside the trailer and then returned
directly to her home. When Holmes arrived, she gave him the
promised eight-ball of cocaine.
 On September 3, the MDEA again set Holmes into motion. 
On this occasion, he gave Spinney $250 at her dwelling. She said
that she would go "to Duck Puddle" to retrieve the cocaine and that
her supplier was waiting for her "at Junior's house." Agents
followed Spinney and a companion, later identified as William
Holmstrom, to Duck Puddle Road. They were last seen heading in the
direction of the Ralph Wink Road. After a ten-minute interval, an
agent observed the pair traveling from the direction of the Ralph
Wink Road. At that point, the officers arrested both Spinney and
Holmstrom. Spinney had cocaine in her purse.
 Upon interrogation, Spinney told the agents that she
bought the cocaine for $200 from "Junior" just prior to her arrest
and that "Junior" lived in a trailer on the Ralph Wink Road. She
added that she had purchased cocaine from "Junior" at his trailer
on about 30 occasions and referred to him at one point as "Junior
Winchenbach." When asked whether "Junior" was Ralph Winchenbach,
Jr., Spinney replied that she thought so.
 The MDEA promptly applied for a warrant to search, inter
alia, "[t]he Ralph Winchenbach Jr and Arlene Winchenbach residence
in Waldoboro, located on the Ralph Wink [R]oad box # 277" as well
as "[a]ny and all people present and arriving at the residence at
the time of the search, including but not limited to Ralph
Winchenbach Jr and Arlene Winchenbach." The affidavit supporting
the warrant described the location and appearance of the trailer at
some length and stated unequivocally that it was the same trailer
that Spinney had described to the arresting officers. A state
magistrate granted the application and issued a warrant that
authorized a search of the premises.
 The same evening, a team of officers went to the
appellant's trailer on the Ralph Wink Road to execute the search
warrant. When the appellant opened the door, the officers
immediately entered the trailer, arrested him, brought him outside,
and searched him. They discovered over $1,000 on his person,
including $80 of the "buy money" that the MDEA had given to Holmes
earlier that day.
 A federal grand jury indicted the appellant for
distribution of cocaine. See 21 U.S.C. 841(a)(1). The district
court denied his motion to suppress the evidence obtained as a
result of the arrest and the ensuing search of his person, noting
that the officers had probable cause to effect an arrest and that
they were lawfully present in the appellant's home. See
Winchenbach, 31 F. Supp. 2d at 165-67. A petit jury subsequently
found the appellant guilty, and the district court imposed a 37-
month incarcerative sentence. This appeal followed. In it,
Winchenbach challenges both the denial of his motion to suppress
and an evidentiary ruling. We address these questions seriatim.
II. THE MOTION TO SUPPRESS
 The appellant argues that his arrest was unlawful and
that, therefore, the district court should have suppressed the
evidence gleaned from the search of his person. The second half of
this argument depends on the validity of the first: it is settled
beyond peradventure that a search of an individual's person made
incident to a valid arrest is itself valid, despite the absence of
an arrest warrant. See, e.g., United States v. Robinson, 414 U.S.
218, 224 (1973); Chimel v. California, 395 U.S. 752, 762-73 (1969). 
Put another way, "[t]he fact of a lawful arrest, standing alone,
authorizes a search." Michigan v. DeFillippo, 443 U.S. 31, 35
(1979). Hence, we turn directly to the legitimacy of the arrest.
 The appellant does not contest the bona fides of the
warrant that authorized the search of his dwelling but, rather,
asseverates that a search warrant, unaccompanied by an arrest
warrant, can never support an arrest of an individual in his own
home. Building on this foundation, he posits that the fruits of
the subsequent search of his person must be suppressed. The
government responds that because the search warrant enabled the
officers lawfully to enter the home and because probable cause
existed to believe that the appellant had committed a crime, the
officers had a right to effect an arrest without first pausing to
secure a separate arrest warrant. The district court adhered to
the government's view and refused suppression. See Winchenbach, 31
F. Supp. 2d at 167. We assess its conclusions of law de novo but
scrutinize its factual findings only for clear error. See United
States v. Schaefer, 87 F.3d 562, 565 (1st Cir. 1996); United States
v. Zapata, 18 F.3d 971, 975 (1st Cir. 1994). "'[T]he decision
whether these historical facts, viewed from the standpoint of an
objectively reasonable police officer, amount to . . . probable
cause' presents a mixed question of law and fact which is subject
to plenary review." United States v. Meade, 110 F.3d 190, 193
(1st Cir. 1997) (quoting Ornelas v. United States, 517 U.S. 690,
696 (1996)).
 The appellant's primary position, purportedly grounded in
the Supreme Court's decision in Payton v. New York, 445 U.S. 573,
576 (1980), is that law enforcement officers can never arrest a
person in his home unless they first obtain an arrest warrant. But
Payton does not sweep so broadly. To be sure, the Payton Court
held on particular facts that officers who did not possess an
arrest warrant could not enter the defendant's home to arrest him. 
See id. at 590. As subsequent cases demonstrate, however, Payton
does not purport to declare an absolute rule. One recognized
exception involves exigent circumstances. See, e.g., Hegarty v.
Somerset County, 53 F.3d 1367, 1374 (1st Cir. 1995). Another
applies to parolees and persons on probation. See, e.g., United
States v. Cardona, 903 F.2d 60, 67, 69 (1st Cir. 1990). A third,
the precise scope of which is here at issue, permits the police to
arrest an individual in his home, without an arrest warrant, as
long as they are lawfully on the premises (by reason, say, of a
search warrant) and probable cause exists. See, e.g., Mahlberg v.
Mentzer, 968 F.2d 772, 775 (8th Cir. 1992); United States v.
Houston, 892 F.2d 696, 701-02 (8th Cir. 1989); Jones v. City of
Denver, 854 F.2d 1206, 1209 (10th Cir. 1988). In these cases, the
police discovered the evidence that gave rise to probable cause
during a lawful search of the premises and then arrested the
occupant. We have found one case, United States v. Price, 888 F.2d
1206 (7th Cir. 1989), in which the court treated the arrest as
taking place (with probable cause) immediately upon entry by the
police, prior to any search. See id. at 1208-09; see generally 3
Wayne R. LaFave, Search and Seizure 6.1(c), at 245 (3d ed. 1996). 
We deem both situations to be covered by the same principle. We
explain briefly.
 Courts typically have predicated this exception on a
"greater subsumes the lesser" analysis, reasoning that:
 A search warrant represents a judicial
 determination that there is probable cause to
 invade the privacy of the suspect's home. The
 impartial determination that supports the
 issuance of a search warrant justifies a
 greater intrusion than that supporting the
 issuance of an arrest warrant. Thus, once an
 officer has procured a search warrant, the
 privacy interests that led to the imposition
 of an arrest warrant requirement in Payton
 have been protected.

Jones, 854 F.2d at 1209 (italics omitted). This analysis does not
contradict Payton, as the Court there did not speak so much to the
matter of arrest as to the matter of unauthorized entry into a
dwelling. See Payton, 445 U.S. at 588-90; see also New York v.
Harris, 495 U.S. 14, 17 (1990) (explaining that "the rule in Payton
was designed to protect the physical integrity of the home"). 
Thus, the logic underpinning Mahlberg and Jones embraces equally
cases where, as here, an arrest takes place immediately after the
officers' arrival at the dwelling and is based on previously-
acquired probable cause. After all, "Payton is grounded (as the
Court put it) in 'the breach of the entrance to an individual's
home.' That is, it is the otherwise unauthorized entry and not the
arrest which gives rise to the warrant requirement." LaFave,
supra, 6.1(c) at 249 (emphasis supplied); accord 1 David S.
Rudstein et al., Criminal Constitutional Law 2.05[3], at 2-189 to
2-190 (1998) ("A police officer acting upon probable cause also may
make a warrantless arrest in premises not open to the general
public when he has lawfully entered the premises, for example,
pursuant to a search warrant . . . .").
 We believe it follows that, once the police gain lawful
entry to residential premises (as by a search warrant), an
immediate arrest is permissible without a separate arrest warrant
as long as evidence known to the officers before the search
supplies probable cause for the arrest. See LaFave, supra, 
6.1(c), at 249 & n.114 (citing, inter alia, the Mahlberg line of
cases). While the matter apparently is one that has received
little attention in the federal appellate courts, a number of
respected state courts, applying federal constitutional principles,
have reached this conclusion. See, e.g., State v. Ware, 365 N.W.2d
418, 421 (Neb. 1985); People v. Kite, 423 N.E.2d 524, 526, 530-31
(Ill. App. Ct. 1981); State v. Turner, 627 P.2d 1324, 1326-28
(Wash. Ct. App. 1981); State v. Ruth, 435 A.2d 3, 6-7 (Conn. 1980);
cf. People v. McCarter, 173 Cal. Rptr. 188, 193, 196 (Cal. Ct. App.
1981) (applying California law and holding that "[i]f officers have
authorization to enter the home, an arrest inside is of no greater
constitutional significance than an arrest elsewhere").
 The appellant, who cites no case (federal or state) that
holds to the contrary, resists this view, complaining that it
diminishes the stature of arrest warrants and renders them
virtually obsolete. There is a kernel of truth in this lament, but
warrantless felony arrests outside of the home routinely have
survived constitutional attack as long as probable cause exists. 
See, e.g., Tennessee v. Garner, 471 U.S. 1, 7 (1985); United States
v. Watson, 423 U.S. 411, 423-24 (1976). From a Fourth Amendment
standpoint, there is no valid reason why the same principle should
not apply to arrests within a suspect's residence so long as the
police are there lawfully. In that event, "a warrantless arrest
there is no more objectionable than a warrantless arrest on the
street." LaFave, supra, 6.1(b), at 236 n.56.
 The appellant also suggests that following this rule will
permit the police to play cat and mouse with a suspected criminal,
forgoing an arrest warrant despite the ascertained existence of
probable cause and postponing an arrest until the mood strikes. 
This argument has been made and rejected before in analogous
contexts, see, e.g., Watson, 423 U.S. at 414, 423-24 (holding that
a warrantless arrest based on probable cause may be made in a
public place even though the officers had ample prior opportunity
to obtain an arrest warrant, yet eschewed that course); United
States v. DeMasi, 40 F.3d 1306, 1312 (1st Cir. 1994) (refusing "to
attach significance to the fact that the government had ample time
to obtain a warrant but declined to procure one"), and we reject it
here. Put simply, when probable cause exists, the timing of an
arrest is a matter that the Constitution almost invariably leaves
to police discretion. See, e.g., Watson, 423 U.S. at 423-24;
United States v. Bizier, 111 F.3d 214, 216-17, 220 (1st Cir. 1997).
 We hold, therefore, that if the police have gained lawful
entry to an individual's home based on a valid search warrant, they
may arrest the individual before commencing the search, provided
that they have probable cause to do so. Consequently, the issue
before us reduces to whether the facts and circumstances within the
agents' knowledge at the time of Winchenbach's arrest were
sufficient to yield probable cause. Like the district court, see
Winchenbach, 31 F. Supp. 2d at 165, we conclude that they were.
 Prior opinions guide this inquiry. We begin with
bedrock: probable cause to effect an arrest does not require the
same level of certitude or quantum of proof that is necessary to
convict. See United States v. Figueroa, 818 F.2d 1020, 1023 (1st
Cir. 1987). Instead, probable cause exists when, "at th[e] moment
[the arrest is made,] the facts and circumstances within [the
officers'] knowledge and of which they had reasonably trustworthy
information were sufficient to warrant a prudent [person] in
believing that the [individual] had committed or was committing an
offense." Beck v. Ohio, 379 U.S. 89, 91 (1964). For this purpose,
the "fellow officer" rule applies, so that as a general matter
(subject to exceptions not pertinent here), the focus is upon the
collective knowledge possessed by, and the aggregate information
available to, all the officers involved in the investigation. See
Meade, 110 F.3d at 193-94.
 We need not dwell on generalities. In the last analysis,
probable cause requires practical, context-specific determinations,
made case by case, that give due weight to the totality of the
circumstances and the trial court's superior coign of vantage. See
Illinois v. Gates, 462 U.S. 213, 232 (1983); United States v.
Aguirre, 839 F.2d 854, 857-58 (1st Cir. 1988). If the
circumstances supportably found "warrant the officer's reasonable
belief that the action taken is appropriate, the arrest is
justified." Logue v. Dore, 103 F.3d 1040, 1044 (1st Cir. 1997). 
Thus, the dispositive question here is whether the officers'
collective knowledge at the moment of the arrest justified a
prudent person in believing that the appellant had distributed
cocaine.
 Having reviewed the stipulated record with care, we find
the answer to this question readily apparent. The MDEA had
received several tips that the appellant was selling drugs on the
Ralph Wink Road and had responded by enlisting Holmes's cooperation
and placing Spinney under episodic surveillance. Prior to each
"controlled" purchase of cocaine, the agents searched Holmes to
ensure that he had no contraband and on three of the four
occasions, he returned with cocaine. During each of the four
contemplated transactions, the authorities followed Spinney either
to the Ralph Wink Road (where the appellant resided) or to Duck
Puddle Road (which led to the Ralph Wink Road). On the latter
occasions, the lawmen witnessed her return from the direction of
the Ralph Wink Road. Once, two MDEA agents actually followed
Spinney to the appellant's trailer (where she apparently obtained
cocaine). In conversation, Spinney told Holmes, among other
things, that her cocaine source was "Junior," who lived in
Waldoboro. To cap matters, at the time of the last transaction,
Spinney (1) told Holmes that her supplier was waiting for her "at
Junior's"; (2) informed her captors when arrested that she had just
purchased the cocaine found in her purse from "Junior Winchenbach,"
who lived in a trailer on the Ralph Wink Road; and (3) described a
long course of dealing that involved roughly 30 purchases from
"Junior" at that locus. What Spinney had to say was corroborated
not only by Holmes and by the officers' own observations, but also
by Holmstrom, who confirmed that he had accompanied Spinney to the
Ralph Wink Road to obtain cocaine on the day of her arrest.
 The appellant counters this formidable factual array by
suggesting that the record does not foreclose other inferences. 
For instance, Spinney might have purchased the cocaine from the
appellant's brother, Dale Winchenbach, a known cocaine user who
previously had owned the trailer and who still lived on the Ralph
Wink Road, albeit in another mobile home. Nor is this all; he
offers several other possible scenarios. No useful purpose would
be served by debating these alternatives. The probable cause
standard does not require the officers' conclusion to be ironclad,
or even highly probable. Their conclusion that probable cause
exists need only be reasonable. See Texas v. Brown, 460 U.S. 730,
742 (1983); United States v. Feliz, 182 F.3d 82, 87 (1st Cir.
1999), petition for cert. filed, ___ U.S.L.W. ___ (U.S. Sept. 23,
1999) (No. 99-6383).
 The same logic dooms the appellant's argument that,
during the final transaction, Spinney did not have sufficient time
to drive to and from the Ralph Wink Road. The appellant's
calculations are based on rough estimates and do no more than
reveal a minor temporal disparity. Given the facts as a whole,
this disparity does not suffice to render unreasonable the
officers' belief that Spinney purchased cocaine from the appellant.
 The appellant also faults the controls employed by the
agents and remonstrates that, as a result, Spinney's statements
lacked corroboration. In United States v. Khounsavanh, 113 F.3d
279 (1st Cir. 1997), however, we remarked that "[t]he risk that
[an] informant is lying or in error need not be wholly eliminated. 
Rather, what is needed is that 'the probability of a lying or
inaccurate informer has been sufficiently reduced by corroborative
facts and observations.'" Id. at 284 (citation omitted). In our
view, the evidence gathered here, including several recorded
conversations between Holmes (who at times wore a body wire) and
Spinney and the agents' own observations (especially those
pertinent to the third transaction), affords sufficient
corroboration to reduce the risk of error to an acceptable level.
 We will not paint the lily. Taking the totality of the
circumstances presented, the agents' belief that the appellant was
engaged in the distribution of cocaine was eminently reasonable,
and the facts as supportably found by the trial court, see
Winchenbach, 31 F. Supp. 2d at 160-62, provide solid underpinning
for the court's conclusion that probable cause for the appellant's
arrest existed. It follows inexorably that the lower court did not
err in denying the suppression motion.
III. THE EVIDENTIARY QUESTION
 At trial, the appellant called Arlene Jones's son, Robbie
Flint, as an alibi witness. Flint testified, inter alia, that the
appellant was not in the trailer when Spinney arrived on September
3. On cross-examination, the following exchange took place:
 Q: Do you have any knowledge of [the
 appellant's] selling drugs or being involved
 in drugs on September 3rd 1997?

 A. No.

 Q: None at all?

 A: No.

 Q: As far as you know he was not involved in
 anything?

 A: Right.

 Q: . . . [I]n that interview with [agent] Dan
 Bradford, you did talk about [the appellant's]
 drug activity that night, didn't you?

 A: No.

 Q: You didn't? Well, isn't it true that what
 you told Dan Bradford was that the night that
 MDEA searched the house . . . they missed
 several ounces of cocaine that were buried in
 jars outside the residence?

 A: No.

 Q: You did not tell that to Dan Bradford?

 A: No I didn't.

On redirect examination, defense counsel ignored this testimony. 
In rebuttal, however, the prosecutor called Bradford and sought to
interrogate him about the conversation. The court overruled the
appellant's objections, and Bradford testified that he spoke with
Flint some months after the fact and that Flint, in an effort "to
redeem himself" for assisting in a jailbreak, told him that the
agents overlooked a quantity of buried cocaine during the search of
Winchenbach's trailer. The judge then instructed the jury to
consider Bradford's testimony only as it related to Flint's
credibility and not for the truth of the matter asserted.
 We review the district court's admission of this evidence
for abuse of discretion. See United States v. Houlihan, 92 F.3d
1271, 1297 (1st Cir. 1996), cert. denied, 519 U.S. 1118 (1997). 
The appellant maintains that such an abuse occurred because the
court should have excluded Bradford's testimony under either Fed.
R. Evid. 608(b) or Fed. R. Evid. 403. We address both objections.
 A. Rule 608(b).
 In this court, as below, the government parries the
appellant's Rule 608(b) objection by claiming that Rule 613(b), not
Rule 608(b), controls. On a superficial level at least, an
apparent tension exists between these two rules. Rule 608(b) bars
the credibility-related use of some extrinsic evidence, while Rule
613(b), albeit by negative implication, permits the credibility-
related use of some extrinsic evidence if the proponent satisfies
certain enumerated conditions. In this instance, the appellant
characterizes Bradford's testimony as extrinsic evidence relating
to a specific instance of Flint's misconduct, offered by the
prosecutor to attack Flint's credibility (and thus prohibited by
Rule 608(b)). The government demurs, characterizing the testimony
as extrinsic evidence of a prior inconsistent statement made by
Flint, offered after Flint had been afforded an opportunity to
explain or deny the remark and in circumstances wherein the
appellant had a full opportunity to interrogate both Flint and
Bradford on the matter (and thus admissible under Rule 613(b)).
 At first blush, neither of these characterizations seems
implausible but they cannot both be right. There are, moreover,
two wrinkles. In the first place, the district court, though
deeming the evidence admissible, mistakenly relied on Rule 608(b). 
This bevue need not detain us, for the trial court's use of an
improper ground for admission of evidence is harmless if the
evidence was admissible for the same purpose on some other ground. 
See United States v. Walsh, 928 F.2d 7, 10 n.10 (1st Cir. 1991);
United States v. Nivica, 887 F.2d 1110, 1127 (1st Cir. 1989). 
Thus, this wrinkle irons itself out.
 In the second place, each party presses a theory that
fails to fit. The appellant seems to say that the evidence should
be excluded under Rule 608(b) simply because it was offered to
impugn Flint's credibility. This is an overbroad generalization
which, among its other vices, contradicts the time-honored tenet
that prior inconsistent statements ordinarily may be used to
impeach a witness's credibility. See United States v. Hale, 422
U.S. 171, 176 (1975); United States v. Martin, 694 F.2d 885, 888
(1st Cir. 1982); see also 4 Jack B. Weinstein & Margaret A. Berger,
Weinstein's Federal Evidence 613.02[1] (2d ed. 1997). In the
bargain, this interpretation of Rule 608(b) leaves no room at all
for the admission of extrinsic impeachment evidence under the
auspices of Rule 613(b). Thus, we reject it.
 For its part, the government urges us to hold that a
strict statement/conduct dichotomy triggers the choice of rule. 
Under this dichotomy, Rule 613(b) always would apply to statements
and Rule 608(b) always would apply to conduct. A glance at the
case law unmasks this gross oversimplification. Cases invoking
Rule 608(b) in respect to statements, as opposed to conduct, are
not uncommon. See, e.g., United States v. Cudlitz, 72 F.3d 992,
996 (1st Cir. 1996) (dealing with prior perjurious statements);
United States v. Brooke, 4 F.3d 1480, 1484 (9th Cir. 1993) (dealing
with defendant's bogus claim to be suffering from terminal cancer
in prosecution for manufacture of a destructive device); United
States v. Sellers, 906 F.2d 597, 602 (11th Cir. 1990) (dealing with
witness's lie to secure hospital admission, unrelated to ongoing
prosecution). The commentators likewise abjure the proffered
distinction. See, e.g., 1 Kenneth S. Broun et al., McCormick on
Evidence 41, at 138 n.5 (4th ed. 1992) (citing cases listing
perjury and false statements as among the instances of conduct
covered by Rule 608(b)). We, too, reject it.
 Although we cannot accept either of the parties' self-
serving taxonomies, we think that there is a principled distinction
between the types of evidence covered by the two rules. In our
view, Rule 613(b) applies when two statements, one made at trial
and one made previously, are irreconcilably at odds. In such an
event, the cross-examiner is permitted to show the discrepancy by
extrinsic evidence if necessary not to demonstrate which of the
two is true but, rather, to show that the two do not jibe (thus
calling the declarant's credibility into question). See, e.g.,
United States v. Higa, 55 F.3d 448, 451-52 (9th Cir. 1995); Kasuri
v. St. Elizabeth Hosp. Med. Ctr., 897 F.2d 845, 853-54 (6th Cir.
1990); United States v. Causey, 834 F.2d 1277, 1282-83 (6th Cir.
1987); United States v. Lay, 644 F.2d 1087, 1090 (5th Cir. 1981). 
In short, comparison and contradiction are the hallmarks of Rule
613(b). As one treatise puts it:
 The theory of attack by prior inconsistent
 statements is not based on the assumption that
 the present testimony is false and the former
 statement true but rather upon the notion that
 talking one way on the stand and another way
 previously is blowing hot and cold, and raises
 a doubt as to the truthfulness of both
 statements.

McCormick on Evidence, supra, 34, at 114.
 In contrast, Rule 608(b) addresses situations in which a
witness's prior activity, whether exemplified by conduct or by a
statement, in and of itself casts significant doubt upon his
veracity. See Kasuri, 897 F.2d at 854. Thus, Rule 608(b) applies
to, and bars the introduction of, extrinsic evidence of specific
instances of a witness's misconduct if offered to impugn his
credibility. See McCormick on Evidence, supra, 41, at 138. So
viewed, Rule 608(b) applies to a statement, as long as the
statement in and of itself stands as an independent means of
impeachment without any need to compare it to contradictory trial
testimony. See, e.g., Cudlitz, 72 F.3d at 996; Brooke, 4 F.3d at
1484; United States v. Lopez, 944 F.2d 33, 37-38 (1st Cir. 1991);
United States v. Jackson, 882 F.2d 1444, 1448 (9th Cir. 1989).
 Applying this analysis to the case at hand, Bradford's
testimony falls within the compass of Rule 613(b). At trial, Flint
denied any knowledge of drug dealing at the premises, of the
appellant's involvement with drugs, or of having told the agent
about jars of cocaine buried in the yard. Bradford's testimony 
that Flint had told him that the MDEA, in searching the premises,
had overlooked several ounces of buried cocaine directly
contradicted Flint's trial testimony in all three respects and
therefore constituted extrinsic evidence of a prior inconsistent
statement.
 The appellant's contrary argument will not work unless
the statement attributed to Flint by Bradford, standing alone and
without any reference to Flint's trial testimony, somehow calls
into question Flint's credibility. The testimony fails this test: 
the appellant does not squarely argue that the mere assertion that
the officers missed some buried jars of cocaine during their search
of the premises, offered in an effort to cooperate with law
enforcement, sinks to the level of an affirmative example of
Flint's misconduct such as would significantly affect Flint's
credibility, and such an argument, if made, would be unconvincing. 
It is only the comparison of the earlier statement with Flint's
trial testimony that imbues the evidence with probative value for
impeachment purposes.
 That ends the matter. Inasmuch as Flint was afforded an
opportunity to explain or deny the prior inconsistent statement and
the appellant had a chance to interrogate him about it, the
conditions for the operation of Rule 613(b) were fully satisfied. 
Unless some other ground of objection looms a matter to which we
now turn Bradford's testimony was admissible under that rule. 
See Causey, 834 F.2d at 1283; Lay, 644 F.2d at 1090.
 B. Rule 403.
 As a fallback, the appellant contends that the district
court should have excluded Bradford's testimony on the ground that
its unfairly prejudicial effect overbalanced its legitimate worth. 
This contention rests on Fed. R. Evid. 403, which provides in
pertinent part that relevant evidence "may be excluded if its
probative value is substantially outweighed by the danger of unfair
prejudice, confusion of the issues, or misleading the jury."
 We review the admission or exclusion of evidence under
Rule 403 for abuse of discretion. See United States v. Rivera-
Gomez, 67 F.3d 993, 997 (1st Cir. 1995); United States v. Ingraham,
832 F.2d 229, 233 (1st Cir. 1987). We afford wide latitude to
trial courts in these purlieus, taking care to "evaluate the trial
court's decision from its perspective when it had to rule and not
[to] indulge in review by hindsight." Old Chief v. United States,
519 U.S. 172, 182 n.6 (1997). "Only rarely and in
extraordinarily compelling circumstances will we, from the vista
of a cold appellate record, reverse a district court's on-the-spot
judgment concerning the relative weighing of probative value and
unfair effect." Freeman v. Package Mach. Co., 865 F.2d 1331, 1340
(1st Cir. 1988).
 Virtually all evidence is designed to be prejudicial
(i.e., to help one side's case and to hurt the other's); therefore,
Rule 403 concerns itself not with prejudice per se but with unfair
prejudice. It guards against "the capacity of some concededly
relevant evidence to lure the factfinder into declaring guilt on a
ground different from proof specific to the offense charged." Old
Chief, 519 U.S. at 180. Attempting to wrap himself in this mantle,
the appellant hypothesizes that Bradford's testimony ineluctably
led the jury to believe that the appellant was "a big time drug
dealer." Appellant's Br. at 24.
 In passing upon this objection at trial, the lower court
made a balanced apprisal of the situation. In the process, the
court noted the high probative value of the evidence Flint, after
all, was an alibi witness whose testimony, if credited, would have
exonerated Winchenbach and concluded that it was not unduly
prejudicial. In these circumstances, we discern no abuse of the
court's discretion.
 We add only two comments. First, the prosecutor already
had brought the contents of the purported conversation to the
jury's attention when, without objection, he cross-examined Flint
about it. This draws much of the sting from the appellant's claim. 
See Ingraham, 832 F.2d at 236 (suggesting that the court, when
performing the requisite balancing under Rule 403, may take into
account the jury's familiarity with the substance of the evidence). 
Second, the court prudently minimized any unfairly prejudicial
impact by an immediate instruction that directed the jury to
consider the statements attributed to Flint only "for the limited
purpose of whatever effect they may have in your judgment upon
[his] credibility." In that connection, the court explicitly
warned the jurors not to "use [the evidence] for the purpose of
proving the truth of what [Flint] said out-of-court." We have
frequently remarked the prophylactic effect of such limiting
instructions, see, e.g., Houlihan, 92 F.3d at 1285; United States
v. O'Bryant, 998 F.2d 21, 26 (1st Cir. 1993), and see no reason in
this instance to abandon the "almost invariable assumption of the
law that jurors follow their instructions," Richardson v. Marsh,
481 U.S. 200, 206 (1987).
IV. CONCLUSION
 We need go no further. For the reasons stated, we uphold
the district court's denial of the appellant's motion to suppress
and reject the appellant's claim that the jury should not have been
allowed to hear extrinsic evidence anent Flint's prior inconsistent
statement to Bradford as an aid to evaluating Flint's credibility. 
For aught that appears, Winchenbach was fairly tried and justly
convicted.

Affirmed.